## COMMERCIAL STANDARD INS. CO. v. ROBERTSON.

### No. 10323.

Circuit Court of Appeals, Sixth Circuit.

Feb. 4, 1947.

Joe Roberts, of Chattanooga, Tenn., and John Cate, of Nashville, Tenn. (Frazier & Roberts, of Chattanooga, Tenn., on the brief), for appellant.

Harry Berke, of Chattanooga, Tenn. (Berke & Fleming, of Chattanooga, Tenn., on the brief), for appellee.

Before HICKS, SIMONS and ALLEN, Circuit Judges.

SIMONS, Circuit Judge.

The judgment against the appellant, and by it here assailed as erroneous, was upon a public liability policy issued to a motor carrier, and based primarily upon the terms of a certain endorsement required to be added to the contract for the protection of the public by § 215 of the Interstate Commerce Act, 49 U.S.C.A. § 315, and the rules and regulations of the Interstate Commerce Commission.

The appellant is an insurer authorized to do business in Tennessee. On December 16, 1942, it issued a public liability policy to one Wallace Sims of Chattanooga, Tennessee, doing business as Sims Transfer Company. The basic policy covered the operation of a Chevrolet truck within a radius of 150 miles of Chattanooga, and within the boundaries of Tennessee. Upon his written application for insurance, Sims represented that he had a permit from the Interstate Commerce Commission for operation of his truck in interstate commerce, under I. C. C. certificate No. 38359. He also represented that he had a permit for its operation from the State of Tennessee. At the time the policy was issued there were added two endorsements, one in the form required by § 215 of Part II of the Interstate Commerce Act, commonly known as the Motor Carrier Act of 1935, U.S.C. A., Title 49, § 301 et seq., and orders of the Interstate Commerce Commission of March 25, 1940 and April 4, 1940, 5 F. R. 1382, 1643 (49 Code of Federal Regulations, § 174.1), and the other in a substantially similar form required by Tennessee law and the regulations of the Tennessee Railroad and Public Utilities Commission. In so far as here applicable the I. C. C. endorsement provides:

"The policy to which this endorsement is attached is an automobile bodily injury liability and property damage liability policy, and is hereby amended to assure compliance by the insured, as a motor carrier of passengers or property, with section 215 of the Interstate Commerce Act, and the pertinent rules and regulations of the Interstate Commerce Commission.

"In consideration of the premium stated in the policy to which this endorsement is attached, the Company hereby agrees to pay any final judgment recovered against the insured for bodily injury to or the death of any person or loss of or damage to property of others * * * resulting from the negligent operation, maintenance or use of motor vehicles under certificate of public convenience and necessity or permit issued to the insured by the Interstate Commerce Commission or *otherwise* under Part II of the Interstate Commerce Act, within the limits of liability hereinafter provided, regardless of whether such motor vehicles are specifically described in the policy or not. It is understood and agreed that upon failure of the Company to pay any such final judgment recovered against the insured, the judgment creditor may maintain an action in any court of competent jurisdiction against the Company to compel such payment. * * * The liability of the Company extends to such losses, damages, injuries or deaths whether occurring on the route or in the territory authorized to be served by the insured or elsewhere, except as follows: No Exceptions.

"*Nothing contained in the policy or any other endorsement thereon, nor the violation of any of the provisions of the policy or of any endorsement thereon by the insured, shall relieve the Company from liability hereunder or from the payment of any such final judgment.*" (Italics supplied.)

There follows an agreement by the insured to reimburse the company for any payments made by it in pursuance of its obligations under the endorsements.

On December 20, 1942, Sims' truck, while being operated as a public carrier in the hauling of household goods for hire, was involved in an accident upon U. S. Highway No. 27, near Lancaster, Kentucky, which resulted eventually in the death of Matthews, a passenger, the appellee's decedent. There is some dispute as to whether the insurer was notified of the accident, but on or about January 1, 1943, its agent, Gambill, received information that Sims did not have either an I. C. C. certificate or a Tennessee permit. Gambill advised Sims of this and the latter requested that the policy remain in force and he would attempt to straighten the matter out. On February 25, 1943, however, the company canceled the policy on the asserted ground of non-payment of premium and because it had discovered that the applicant was a negro. Sims had paid $99.06 in premiums, and owed $80 when the policy was canceled. No premiums have been refunded by the insurer.

The appellee, after the death of Matthews, was duly appointed administratrix, instituted suit in the Circuit Court of Hamilton County, Tennessee, against Sims, and recovered a default judgment of $5,000 in May, 1944. The judgment not being paid she instituted suit against the appellant in a Tennessee Court from which it was removed to the court below and tried to the judge without a jury. It there appeared by stipulation of the parties, that Sims had applied to the Interstate Commerce Commission for a certificate of public convenience and necessity; that on March 21, 1938, the Commission had required him to file within 60 days evidence of security for the protection of the public; had given him an additional 30 days on November 14, 1941, and on May 23, 1942, upon his failure to comply with such orders, had dismissed his application, so that at the time the policy was written and on the day of the accident, Sims had not a certificate of public convenience and necessity from the I. C. C. nor did he have a permit from the State of Tennessee. Upon these circumstances the appellant contended that the policy was invalid and that the Sims truck, at the time of the accident, was not within the coverage of the insurance contract. Notwithstanding, the court gave judgment on the ground that the appellant had waived the provisions of the policy and was estopped to assert them. Upon the denial of a mo-

tion for new trial it amplified its reasoning and held that recovery could be based upon the I. C. C. endorsement, even though Sims was operating in interstate commerce without a certificate of convenience and necessity.

The controlling question in the case as we view it, is whether the policy covered the Sims truck at the time of the accident, in view of the broad comprehensive phrasing of the italicized portion of the I. C. C. endorsement previously recited. We are not persuaded that the insurer had waived the provisions of the policy limiting coverage to operations under a certificate of convenience and necessity from the Interstate Commerce Commission. The insurer did not learn that no certificate had issued to Sims until after the accident. The basis of an estoppel resting upon waiver is reliance by one upon the act or representation of another, and subsequent loss or detriment because of such reliance. The rights of the parties here were fixed at the time of the accident, and nothing that occurred afterwards affected them. As was said in Insurance Co. v. Wolff, 95 U.S. 326, 24 L.Ed. 387, "The doctrine of waiver, as asserted against insurance companies to avoid the strict enforcement of conditions contained in their policies, is only another name for the doctrine of estoppel. It can only be invoked where the conduct of the companies has been such as to induce action in reliance upon it, and where it would operate as a fraud upon the assured if they were afterwards allowed to disavow their conduct and enforce the conditions." This view is the basis of many state decisions. Phoenix Ins. Co. v. Stevenson, 78 Ky. 150, 157; Ætna Ins. Co. v. Mount, 90 Miss. 642, 45 So. 835, 15 L.R.A.,N.S., 471; Marion Iron Brass Bed Co. v. Empire State Surety Co., 52 Ind. App. 480, 100 N.E 882; Queen Ins. Co. v. Young, 86 Ala. 424, 5 So. 116, 11 Am.St. Rep. 51. And the mere retention of a premium on a policy of insurance after loss has occurred, where liability is denied, constitutes neither waiver, forfeiture nor estoppel. Goorberg v. Western Assur. Co., 150 Cal. 510, 89 P. 130, 10 L.R.A.,N.S., 876, 119 Am.St.Rep. 246, 11 Ann.Cas. 801;

Dowd v. American Fire Ins. Co., 48 Hun. 619, 1 N.Y.S. 31, 16 N.Y.St.Rep. 342; Capital Fire Ins. Co. v. Shearwood, 87 Ark. 326, 112 S.W. 878. Nor was the operation of Sims in interstate commerce authorized by any temporary permit or any implied authority under the provisions of the Act, as contended by the appellee under authority of the phrase in the endorsement "or otherwise under Part II of the Interstate Commerce Act." This provision relates only to specific cases as where the carrier is operating pending the determination of an application, or where it is operating on temporary approval where two or more carriers have applied for the approval of a consolidation or merger. See Title 49 U. S.C.A. § 310a (b) (c) of the Act.

It will be observed that by the terms of the I. C. C. endorsement, the insurer agrees to pay for bodily injury to or the death of any person resulting from the negligent operation, maintenance or use of motor vehicles *under certificate of public convenience and necessity or permit* issued the insured by the Interstate Commerce Commission. That is clearly a limitation of liability unless the broad language of the italicized portion of the endorsement which immediately follows, expunges the limitation. It is not a reasonable interpretation to construe one clause of an endorsement as eliminating a limitation which another clause clearly preserves. Nor do we think that close analysis of the express language justifies it. The italicized paragraph reads: "Nothing contained in the policy or any *other* endorsement thereon, * * * shall relieve the Company from liability. * * *" The reference is not to "this endorsement" but to "any other endorsement", and no other endorsement is here involved.

We are cited to no case and have found none by independent investigation, which specifically construes the language of the I. C. C. endorsement in the respect here material. There are, however, cases in the Circuit Courts of Appeals determining coverage under endorsements required by state public service commissions, which are substantially similar to that here involved. In

Foster v. Commercial Standard Ins. Co., 10 Cir., 121 F.2d 117, the endorsement was held not to cover a motor vehicle which, at the time of the accident, was being used for personal pleasure driving and not as a public carrier, though an endorsement required by a rule of the Kansas Commission provided that nothing contained in the policy should relieve the insurer from liability. In Hawkeye Casualty Co. v. Halferty, 8 Cir., 131 F.2d 294, certiorari denied 318 U.S. 758, 63 S.Ct. 533, 87 L.Ed. 1131, there was a certificate from the Missouri Commission to operate as a common carrier and a similar policy endorsement. At the time of the accident the truck was not being operated as a common carrier but was being driven to town from a farm where it had been used to haul hay. The insurer was held not liable. In Simon v. American Casualty Co., 4 Cir., 146 F.2d 208, the insurer had issued its policy on a dump truck covering liability as a common carrier. An endorsement of similar phrasing was required by the Public Service Commission of West Virginia, but the basic policy excluded liability for injury to a guest riding on the truck. The insured had a permit from the Commission, but when the accident occurred the truck was being driven for the purpose of bringing the insured and his friends back to the city from a camping trip. The endorsement was held not to apply.

It is urged that these cases are neither controlling nor persuasive because in each of them there was a limitation of liability to motor vehicles employed as common carriers, and they were excluded from coverage because they were not being operated as common carriers. The present coverage is limited not only to operations of motor vehicles as common carriers but as common carriers under a certificate of the Interstate Commerce Commission. It is a fine line which distinguishes the narrower limitation from the broader. That it has been drawn is implicit in two cases. Hindel v. State Farm Mutual Automobile Ins. Co., 7 Cir., 97 F.2d 777, certiorari denied 305 U.S. 647, 59 S.Ct. 153, 83 L.Ed. 418; Continental Casualty Co. v. Shankel, 10 Cir., 88 F.2d 819. In both it was held that limita-

tions on coverage must give way to the broad language of an endorsement imposing absolute liability.

In no one of the cases, however, was there, as here, absence of basic authority to operate motor vehicles as public carriers, in none was consideration given to the paramount importance of such authority and all that it implies, in the assumption of the risk by the insurer, and, of course, no one of them could have considered the purpose and effect of the uniform national policy effectuated by the subsequent enactment of the Motor Carrier Act.

■ By that Act the Congress fashioned a general scheme of regulation for control of all motor carriers engaged in interstate commerce, whether public or private carriers. In respect to public carriers its purpose was not merely to authorize operations necessary and convenient to the public and to control rates and charges, but to insure the safety of their operations in the public interest. In its declaration of a national transportation policy in the Act of September 18, 1940, Ch. 722, Title 1, 54 Stat. 899, 49 U.S.C.A. note preceding section 301, among its objectives was "to promote safe, adequate, economical, and efficient service", all to the end of developing, coordinating and preserving a national transportation system by water, highway and rail as well as other means. In pursuance of that policy the Motor Carrier Act, Title 49 U.S.C.A. § 304(a) (1), provides that the Interstate Commerce Commission may establish reasonable regulations governing "qualifications and maximum hours of service of employees, and safety of operation and equipment." It was given like powers in respect to contract carriers. By § 307(a) the Commission was empowered to issue to qualified applicants a certificate of convenience and necessity, but only "if it is found that the applicant is fit, willing, and able properly to perform the service proposed", and to conform to the requirements, rules and regulations of the Commission. By § 1021 penalties are to be imposed for the violation of any of the provisions of the Act or any rule, regulation, requirement or order thereunder. It would seem, there-

fore, to be clear that among the purposes to be served by the Act, not necessarily least in importance, was the protection of the public on highways of interstate commerce from the hazards of operation by inexperienced, incompetent and unfit persons, by those engaged in excess of maximum hours, or operating with bad conditioned and dangerous equipment. That is now the declared national policy in the public interest.

Two conclusions are to be drawn therefrom. The first is that an insurer undertaking to write public liability policies to motor carriers, is given the assurance by the issuance of a certificate from the Interstate Commerce Commission that the carrier has met the minimum requirements of the Commission in respect to competence of employees, hours of employment and condition of equipment, and will remain thereafter subject to the regulations and orders of the Commission. Without such assurance it is to be assumed that contracts insuring interstate operation would not have been entered into. The second is that it is among the major purposes of the Act to keep unqualified operators and bad conditioned equipment from the highways of interstate commerce.

We are not unmindful of the public interest in an insurance contract which assures the public protection from negligent operation and provides compensation for injuries resulting therefrom. It is this public interest that in the main led to the decision below. We are persuaded, however, that the more fundamental and all-embracing public interest sought to be preserved by the Motor Carrier Act, is the keeping of dangerous operators and instrumentalities off the roads, and that it is this overriding public interest which should govern decision here. To that end there should be no judicial condonation for evasion or defiance of law. When two considerations, both in the public interest, collide and may not be reconciled, it seems to us that the larger and more fundamental public interest must govern.

Judgment reversed. The case is remanded with instructions to enter judgment for the appellant.