**ALLSTATE INSURANCE COMPANY, Appellee,**

v.

**LIBERTY MUTUAL INSURANCE COMPANY, Appellant.**

**No. 15916.**

United States Court of Appeals Third Circuit.

Argued Oct. 7, 1966.

Decided Nov. 14, 1966.

J. B. H. Carter, Philadelphia, Pa. (Edward W. Madeira, Jr., Barry E. Hawk, Philadelphia, Pa., on the brief), for appellant.

Joseph G. Manta, Philadelphia, Pa. (James M. Marsh, Philadelphia, Pa., on the brief.) LaBrum & Doak, Philadelphia, Pa., of counsel for appellee.

Before FORMAN, FREEDMAN and SEITZ, Circuit Judges.

## OPINION OF THE COURT

SEITZ, Circuit Judge.

This is a declaratory judgment action to determine which of two liability insurance carriers owed primary coverage for the liability of the driver of a tractor-trailer involved in a serious accident.

Various actions were commenced by injured parties and by the personal representatives of those killed in the accident to recover damages. One of the defendants in those actions was Arco Auto Carriers, Inc. ("Arco"), the owner of the tractor-trailer involved. It was insured by Allstate Insurance Company ("Allstate"), the plaintiff in this declaratory judgment action. The other defendant in the negligence actions was F. W. Myers Drive-Away System, Inc. ("Myers"), which had leased the equipment with driver prior to the accident. It was insured by Liberty Mutual Insurance Company ("Liberty"), the defendant in this action.

The present declaratory action was instituted while the negligence actions were pending. However, those actions were settled before the trial of this case by an agreement to pay plaintiffs a stipulated amount.[1] The insurance carriers agreed that each would pay one-half with the understanding that the insurer found to be ultimately liable in this action would reimburse the other carrier one-half of the settlement sum plus costs and reasonable attorneys' fees. The issue of liability as between Allstate and Liberty was tried by the court. It held that the driver of the equipment was an "insured" under the Myers policy at the time of the accident and therefore found that Liberty's policy provided primary coverage. It further declared that Allstate had no obligation in connection with the accident. Liberty appeals.

We proceed to a statement of the facts either as found by the trial judge or as reflected in the record without dispute. We are therefore not concerned with any issue as to whether the "clearly erroneous" rule applies. Rather we are concerned with the determination and application of the correct legal principle to undisputed facts.

1. Since this action truly embraced a controversy at the trial date we do not feel called upon to consider the original propriety of the complaint insofar as it sought a determination of the liability of the carriers for any possible recovery in the negligence actions. Compare Nationwide Mutual Ins. Co. v. Fidelity & Casualty Co. of New York, 286 F.2d 91 (3rd Cir. 1961).

Arco, the lessor of the equipment, and Myers, the lessee, were both interstate automobile transport carriers with terminals in South Bend, Indiana. One of Myers' accounts involved the hauling of a certain make of taxicabs from South Bend to New York City. Myers had the required I.C.C. authority for such route, including the return. Arco did not have I.C.C. authority to transport automobiles on this route. Presumably it had the right to return its empty trucks to its home terminal.

On October 10, 1958, Arco and Myers entered into an equipment lease agreement wherein Arco agreed to supply Myers vehicles and drivers as needed for the transportation of automobiles. Although the lease was for one year and never formally renewed, it was considered by the parties and the court below as operative at the time of the accident. We shall view it similarly.

Under the equipment lease Arco was to pay all the cost of operation and maintenance of any vehicle supplied. Arco also furnished a qualified driver and paid all his wages, social security, etc. Arco was also responsible for any damage or wear and tear occurring to the leased equipment. However, it was agreed that Myers was to "have the full control and discretion of the leased unit while operated under this lease and that 'Lessee' shall be fully responsible to the public for the operation of the leased unit.". Arco was to pay Myers the amount of Myers' public liability, property damage and cargo insurance premiums under a formula related to the revenue earned by Myers in the use of the equipment. Myers paid as rental for each piece of leased equipment a sum equal to 95% of the revenue earned by Myers in the use of the equipment.

The lease provided that "The terms of this lease as to any unit involved shall be considered effective when such vehicle is so delivered and shall be considered terminated when such vehicle is released."

On February 10, 1960, Arco provided Myers with a tractor-trailer unit and a driver, James Rider. On that day Arco and Myers executed a document entitled "Memorandum of Lease" which identified the particular unit to be leased and provided for the transportation of the unit from South Bend, Indiana to Bronx, New York "under lease agreement which on this date is in full force and effect."

Rider drove the unit in question east, having properly affixed the Myers' decals to the door sides of his cab as required by the I.C.C. regulations. Rider delivered the taxicabs to their proper point in New York City on the morning of February 22, 1960. He then removed the Myers' decals, placed them in an envelope for mailing back to Myers, and put them on the cab seat. Rider then drove to Arco's terminal in Port Newark, New Jersey, which was Arco's closest terminal to the delivery point. This action was taken pursuant to standard Arco instructions. This procedure was followed because the driver was supposed to turn in his log book and other documents and arrange to be paid for the completed trip. A written receipt on the Memorandum of Lease acknowledging the return of the equipment from the lessee would normally be executed by Arco at such terminal. This was required by I.C.C. regulations. Also, upon reporting to the nearest Arco terminal the driver would be advised by Arco whether arrangements had been made for a load west-bound.

When Rider arrived at Arco's terminal on February 22, he discovered that it was closed because of the holiday and thus he could not deliver the documents and obtain the receipt for the equipment. Another Arco-employed driver was also at the terminal. A phone call was placed, in effect on behalf of both of them, to Arco's terminal in Scranton, Pennsylvania. They asked for instructions and were advised by an authorized agent of Arco to head west. No receipt for the unit was executed. Rider started west with the documents including the decals still in his possession. Near Allentown, Pennsylvania he was involved in the accident which generated the law-

suits described above. The accident was immediately reported to Arco, and its Scranton office thereafter actively took charge of the investigation regarding the accident. Several days later, Arco receipted for the delivery of the equipment.

The parties and the trial court seem to say that the issue for decision is whether Rider, at the time of the accident, came within the definition of an "insured" under the Arco or the Myers' policy. It seems to us that such a statement does not fully describe the issue here. We say this because it is possible that either or both of the carriers could have been found to be the "insured" as to successful plaintiffs in the negligence actions. Compare Walters v. Dunlap, 368 F.2d 118 Filed November 7, 1966 (3rd Cir., 1966). Nevertheless, in determining the issue of ultimate responsibility as between the two insurers here involved—which is the issue here—the result may turn on factors not relevant to the negligence and subsequent garnishment actions. This brings us to the insurance policies involved.

The pertinent provisions of both policies are identical, being found in an endorsement entitled "Receipts Basis—Truckmen". Sections 1(a) (1) and 1(d) of the "Definition of Insured." With regard to persons other than the named insured, the applicable provisions of the policies provide that the insurance does not apply:

"(a) except with respect to an employee of the named insured [a driver furnished with an automobile hired by the named insured is not deemed an employee of the named insured] * * *

"to any agent or employee [of an organization] engaged in the business of transporting property by automobile for the named insured or for others (1) unless the accident occurs while such automobile is being used exclusively in the business of the named insured and over a route the named insured is authorized to serve by federal or public authority * * *

"(d) with respect to any hired automobile, to the owner of any lessee of such automobile, or to any agent or employee of such owner or lessee, if the accident occurs (1) while such automobile is not being used exclusively in the business of the named insured and over a route the named insured is authorized to serve by federal or public authority, or (2) after arrival of the automobile at its destination under a single-trip contract which does not provide in writing for the return trip of the automobile."

The trial court's judgment in favor of Allstate and against Liberty was premised, we believe, on this chain of reasoning: the leases and respective insurance policies must be interpreted in the light of I.C.C. requirements; the I.C.C. regulations require that leases of the present type provide for exclusive possession and control of equipment and driver in the lessee during the term of the lease and further provide for a specific receipt acknowledging the return of the equipment upon termination of the lease. 49 C.F.R. §§ 207.4(c); 207.4(a) (6) and 207.4(b); this lease so provided. At the time of the accident the lease had not been terminated because no receipt had been executed by Arco and thus the exclusive right to possession and control remained in Myers. Therefore, at the time of the accident the leased unit and driver were "engaged exclusively" in the business of Myers. Thus, Myers and its insurer were necessarily liable to the public and therefore, as between the respective insurance carriers, the lessee's carrier was required to shoulder the loss. Liberty's various arguments in essence attack the court's conclusion that as between the carriers I.C.C. policy considerations were applicable.

We commence our analysis by assuming without deciding that the lessee's insurer could not evade liability to the public in this factual situation particularly since the receipt for the return of the equipment had not been executed prior to the accident. This assumption gives full effect to the provisions of the

Equipment Lease that while operating under the lease the Lessee was to be fully responsible to the public for the operation of the leased unit. See Mellon National Bank & Trust Company v. Sophie Lines, Inc., 289 F.2d 473 (3rd Cir., 1961). Contrary to the trial court's approach, this case does not involve a question of implementing lease provisions which are required for the protection of the public. Rather we are concerned with responsibility as between insurance carriers.

Liberty contends, inter alia, that subparagraph (d) makes it clear that its policy removed it from at least primary liability here because it did not apply after the unit arrived at its destination under the lease here involved.

Certain it is that the accident occurred after the equipment had arrived at its destination under a single trip contract which did not provide in writing for the return trip. We do not believe the equipment lease and the Memorandum of Lease for the trip in question alter this conclusion. They are properly read together.

Thus, this accident was not covered by the terms of Liberty's policy unless it can be said, for policy purposes, that the equipment had not arrived at its destination because only the execution of the receipt would be evidence of that fact. In determining liability as between the lessor's and the lessee's insurers we find such a construction unreasonable. First, it is not required to protect the public and so I.C.C. considerations are not determinative. In addition, it is particularly pertinent that the contractual obligations of these parties made it amply evident that the lessee was leasing the equipment for a one way trip and that in fact the vehicle had arrived at its destination and the lessor had resumed complete control of it before the accident. Considering these insurance policies against this background, we think it is entirely just to impose the liability on the lessor's insurance carrier.

We therefore conclude that as between insurers, the lessor's insurer must bear the ultimate liability here. We find it unnecessary to decide whether the same result might be reached by reference to other provisions of Liberty's policy which are relied on by its counsel.

The judgment of the District Court will be reversed with instructions to enter an appropriate judgment in favor of Liberty and against Allstate.