COSMOPOLITAN MUTUAL INSURANCE COMPANY, a corporation of the State of New York, Plaintiff,

v.

John H. WHITE et al., Defendants,

v.

S. & E. McCORMICK, INC., a corporation of the State of Delaware, Defendant on Counterclaim.

Civ. A. No. 3887.

United States District Court,
D. Delaware.

Jan. 5, 1972.

---

F. Alton Tybout, and Richard W. Pell, of Tybout, Redfearn & Schnee, Wilmington, Del., for plaintiff and defendant on counterclaim.

Arthur G. Connolly, Jr., of Connolly, Bove & Lodge, Wilmington, Del., Joseph H. Flanzer, Emmett J. Conte, Jr., James J. Horgan, John Biggs, III, and A. James Gallo, Wilmington, Del., of counsel, for defendants.

## OPINION

CALEB M. WRIGHT, Chief Judge.

The instant action is a declaratory judgment action in which the parties are seeking to have their respective rights and obligations in a certain contract of insurance adjudicated. Commenced originally by the plaintiff, Cosmopolitan Mutual Insurance Company (Cosmopolitan) in the Delaware Superior Court against the eleven individual defendants,[1] the action was subsequently removed to this Court pursuant to the defendants' petition under 28 U.S.C. § 1441. After removal, the defendants filed a counterclaim for a declaratory judgment against the plaintiff and S. & E. McCormick, Inc. (McCormick) which was joined as defendant on the counterclaim.

In essence, the issue before the Court is whether Cosmopolitan and McCormick, either jointly or individually, have a potential liability to any or all of the defendants as a result of an accident which occurred in New Castle County, Delaware, on November 3, 1966, when a tractor and trailer owned by one defendant, John H. White (White), and driven by another defendant, Isaac Desmuke (Desmuke), struck an automobile in which several of the other individual defendants were traveling. The nine individual defendants excluding White and Desmuke are plaintiffs in a Superior Court action commenced against White and Desmuke for personal injuries and wrongful death claims arising out of the November 3rd collision.[2] The Superior Court case against White and Desmuke has been stayed pending the Court's determination herein since the nine plaintiffs in the state court action acknowledge that unless Cosmopolitan or McCormick is ultimately liable for a judgment in that suit further action in that litigation would be fruitless.

McCormick is a Delaware corporation engaged in the transportation of special commodities in interstate and intrastate commerce by motor vehicle under authority from the Interstate Commerce Commission (ICC) MC#19569 and from the State of Pennsylvania for intrastate commerce under certificate #A7456.

Cosmopolitan was the liability insurance carrier for McCormick at the time of the accident.

Cosmopolitan and McCormick (hereafter also referred to as "the plaintiffs") have requested a declaratory judgment that they can have no potential liability for any judgment which might be rendered against White or Desmuke in the state action or for any judgment which might be rendered in favor of any defendant in this action as a result of the November 3rd accident.

On July 27, 1966, White's tractor had been leased to McCormick under a leasing agreement which complied with the requirements of the ICC regulations regarding the leasing of vehicles to be employed in interstate commerce. The lease was the standard ICC 30 day or more trip lease which would remain in effect until terminated by either lessor

---

1. The case was brought on March 25, 1970 and docketed as Civil Action No. 218–1970 in New Castle County Superior Court.

2. The action is in the Superior Court for New Castle County and numbered Consolidated Action No. 333, 1967, James Steele, et al. v. John H. White and Isaac T. Desmuke, Jr.

or lessee.[3] During the term of the lease, McCormick was to have exclusive possession, control, and use of the tractor and contracted to assume "full responsibility in respect to the equipment it is operating, to the public, the shippers and the INTERSTATE COMMERCE COMMISSION".[4] In addition, White agreed to display McCormick's ICC placard on his tractor, and to "surrender full control, possession, and management of said equipment to the lessee during the terms of this lease. . . ."[5]

The plaintiffs contend that the lease had been terminated effective November 1, 1966 as a result of a letter sent from McCormick to White on October 27, 1966 (Joint Exhibit 4), and that on November 3, 1966, Desmuke was operating the tractor on his own and White's behalf. Since the lease was no longer in effect, the plaintiffs argue that they have no obligation under ICC regulations for any judgment rendered as a result of the November 3rd accident. Even assuming that the lease remained in effect on the date of the accident, the plaintiffs assert that Desmuke was "on a detour and frolic of his own, and was in no way engaged in any activity on behalf of McCormick" (Plaintiffs' Brief, p. 31), and therefore, McCormick would not be liable under the appropriate respondeat superior doctrine. The plaintiffs further contend that even if McCormick could have been found liable initially, since McCormick was not joined prior to the running of the statute of limitations, no judgment may now be rendered against McCormick.

Cosmopolitan maintains that under its insurance contract, it had only insured McCormick and is liable only for a final judgment rendered against McCormick. Since no such judgment may be so rendered, Cosmopolitan asserts that it has no obligation to pay any monies for a judgment arising from the November 3rd accident.

The defendants counter these contentions with several claims in an attempt to establish a prospective right to require both McCormick and Cosmopolitan to pay any judgment rendered in the previously mentioned state court suit against White and Desmuke. Initially, they dispute that the McCormick-White lease of the tractor had been effectively cancelled, and argue that since the lease was in effect, ICC regulations mandate that McCormick is liable for any judgment arising from the negligence of Desmuke in driving the vehicle. Next, they assert that a judgment may still be rendered against McCormick in spite of the running of the statute of limitations on two grounds: 1. McCormick was in privity with White and Desmuke and a judgment against them binds it, and 2. the insurance contract in issue is an indemnity contract in which McCormick and Cosmopolitan agreed to indemnify White and Desmuke and the statute of limitations will not commence to run on this claim against the plaintiffs until after a judgment is rendered against White and Desmuke.

Although both plaintiffs and defendants have frequently discussed the obligations of McCormick and Cosmopolitan as though they are identical, the responsibilities and potential liabilities of each plaintiff vary and must be distinguished where they do not coincide.

■ The Court is of the opinion that on November 3rd the lease agreement between White and McCormick was in effect. Since McCormick had failed to comply with certain ICC regulations regarding termination of leasing contracts, the letter of October 27, 1966 was ineffectual by itself to relieve McCormick of its statutory obligations as interstate motor carriers.[6] ICC regula-

---

3. Joint Exhibit 3. This provision is required by 49 CFR, Ch. 10, ICC, § 1057.4 (a) (3).

4. Joint Exhibit 3. See also 49 CFR § 1057.4(a) (4).

5. Id.

6. White testified that he received no notice of the termination until 1967. Tr. 47, 55–57. White Deposition, 24–26. Since the Court concludes that the letter

tions enumerate several requirements imposed upon its licensed carriers in entering into and terminating leasing arrangements to augment their vehicular equipment. The authorized carrier must give the owner of the leased equipment a receipt for it when the carrier assumes control, and must obtain a receipt from the owner when possession ends. 49 C.F.R. Ch. X, I.C.C., § 1057.4(b). The leasing agreement constitutes White's receipt acknowledging McCormick's exclusive possession. McCormick, however, obtained no such receipt from White prior to the November 3rd accident. In addition, the ICC regulations require that during the term of any lease of equipment, the authorized carrier must properly identify the vehicle by displaying thereon its trade name and ICC number, and that at the termination of the lease this identification shall be removed. 49 C.F.R. §§ 1057.4(d) and (d) (1), 1058.1 and 1058.2. The McCormick ICC placard had been so displayed on White's tractor. However, it was not removed on November 1, 1966 and remained on the tractor when it was involved in the November 3rd accident.

Obtaining a receipt for the return of the vehicle and removing the ICC placard are prerequisites to termination of an ICC lease. Mellon National Bank & Trust Co. v. Sophie Lines, Inc., 289 F.2d 473 (3rd Cir. 1961). In *Mellon*, a tractor owned by the defendant, Sophie Lines, Inc. (Sophie), was involved in an accident when it was leased to the defendant, Turner Transfer, Inc., (Turner), an authorized ICC carrier, under a 30 day or more ICC lease. At the time of the accident, the Turner ICC placard was displayed on the tractor. Turner argued that Sophie's driver was carrying a load for another company without

its approval in violation of the terms of the lease, and therefore, the jury must decide whether it was responsible for the driver's negligence. The court held that the Turner lease was in effect and under the lease, Turner had exclusive control of the vehicle and was liable, as a matter of law, for the accident. Regarding the question of the ICC lease and the proper method of termination, the Court said:

> The truck at the time was under a properly I.C.C. authorized lease to Turner with the latter assuming full responsibility for its operation to the public, the shippers and the I.C.C. Turner could have effectually eliminated its responsibility for the truck's use in only one way i. e. (1) removing '. . . any legend showing it as the operating carrier, displayed on such equipment and . . . any removable device showing it as the operating carrier, before relinquishing possession of the equipment.' (Section 207.4(d) (1)); and (2) obtaining the receipt called for by 207.4(7) (b) which latter reads: '. . . when the possession by the authorized carrier ends, it or its employee or agent shall obtain from the owner of the equipment, or its regular employee or agent duly authorized to act for it, a receipt specifically identifying the equipment and stating therein the date and the time of day possession thereof is taken.'[7]

Establishing a mandatory requirement upon ICC authorized carriers to remove placards and to obtain receipts for the return of the vehicle may impose a substantial burden upon such carriers since the independent contractors are not likely to cooperate after termination. However, the ICC placard and lease agree-

by itself was insufficient to terminate the lease even if received, it need not decide whether notice of the termination was actually given.

7. 289 F.2d at 476–477. The pertinent ICC regulations have subsequently been renumbered, but were not changed in sub-

stance. See: Allstate Insurance Co. v. Liberty Mutual Insurance Co., 368 F. 2d 121 (3rd Cir. 1966); Cox v. Bond Transportation, Inc. 53 N.J. 186, 249 A.2d 579 (N.J.Sup.Ct.1969); and Leotta v. Plessinger, 8 N.Y.2d 449, 209 N.Y.S. 2d 304, 171 N.E.2d 454 (N.Y.Ct. of App. 1960).

ment are the equipment's authorization for being on the road, and when not removed upon cancellation of a lease, subject the public to the evils which Congress attempted to eliminate when prohibiting the previous independent contractor system. The ICC carriers are the only effective institutions capable of insuring that non-leased equipment is kept off the highways, and as possessors of a profitable public franchise, these carriers must assume the responsibility for policing this area. The record does not indicate a single effort on McCormick's part to comply with its ICC obligations. McCormick's failure to remove its ICC placard and to obtain a receipt from White for the return of the tractor mandate a conclusion that the White-McCormick lease remained in effect on November 3, 1966.

Having concluded that the lease had not been cancelled, the Court must resolve the issue of McCormick's liability for the accident as an ICC carrier and lessee of the tractor involved. McCormick argues that since Desmuke was driving without express authorization from McCormick and on his own business, it is not liable for his negligence.

On the date of the accident, Desmuke reported initially to Frank Jock (Jock), McCormick's dispatcher in Glasgow, Delaware, and was informed that there were no McCormick loads available at that time (Desmuke Deposition, 24–29). At that time, Jock neither removed the McCormick ICC placard nor obtained a receipt from Desmuke acknowledging termination of the lease and relinquishment of McCormick's exclusive control over the tractor.

Desmuke states that after informing him of the absence of loads, Jock told him he "could go down to Sparrows Point and sit around and wait to see if some would come in." (Desmuke Dep. 26). While claiming that he did not generally authorize such trips by drivers, Jock could not state definitely that he had given no such authorization to Desmuke.

After his discussion with Jock, Desmuke called Highway Motor Express, another ICC authorized carrier for which Desmuke had previously hauled under a trip lease, and learned that a load might be available. (Desmuke Dep. 39–40). Shortly thereafter Desmuke drove to Sparrows Point, but, there were no loads available with McCormick or Highway Motor Express. He was, however, able to obtain a load from Branch Motor Express from Baltimore to New York City leaving at 6:30 a. m. on November 4th. Rather than remain in Baltimore overnight, Desmuke decided to drive to Wilmington for the night and return to pick up the Branch load the following morning. The accident occurred on his return trip to Wilmington. Since Desmuke had not been dispatched by Jock and was attempting to locate a load on his own, McCormick argues that he was not acting as their employee and that they are not responsible for the accident.

Previous efforts by ICC authorized carriers to avoid liability by attempting to differentiate between uses of leased vehicles which are in the business of the carrier and those which are not have been singularly unsuccessful.[8]

The reasons behind the implementation of the ICC regulations regarding augmenting equipment through leases like the one involved here with requirements of insurance coverage, exclusive possession in the lessee, etc., have been frequently enumerated and examined.[9] Acknowledging the legislative intention to eliminate prior abuses and guarantee

---

8. *Mellon*, supra; *Cox*, supra; American Transit Lines v. Smith, 246 F.2d 86 (6th Cir. 1957); Felbrant v. Able, 80 N.J. Super. 587, 194 A.2d 491 (Super.Ct. N.J.1963); National Trailer Convoy, Inc. v. Saul, 375 P.2d 922 (Okl.Sup.Ct.1962); *Leotta*, supra.

9. See, American Trucking Associations, Inc. v. United States, 344 U.S. 298, 73 S.Ct. 307, 97 L.Ed. 337 (1953); Christian v. United States, 152 F.Supp. 561 (D.Md.1957); *Cox*, supra; Duke v. Thomas, 343 S.W.2d 656, 658–659 (Mo. App.Ct.1961).

protection of the public, the courts have construed ICC regulations strictly against ICC authorized motor carriers.[10]

In Cox v. Bond Transportation, Inc., supra, the court upheld a judgment against Bond Transportation, Inc., (Bond), an ICC authorized carrier, when the tractor involved in the accident was being used by the driver for personal transportation from Bond's terminal to his home after using the vehicle in intrastate commerce throughout the day. Citing the ICC regulations requiring exclusive control, etc., the court affirmed the submission to the jury of the issue of whether driving home served the carrier's interest of Bond and accepted the jury's conclusion that it did. Since Bond had exclusive possession of the equipment under the ICC lease, the vehicle was so identified and the driver had the tractor available for Bond's use at irregular hours, the jury's affirmative response was adequately supported. Regarding the defendant's attempt to escape liability on the basis of the fact that it was not being used on Bond business in interstate commerce the court said:

> Thus under the cases, presence of the decal and the Bond name on the door of the tractor at the time of the accident strongly implies operation thereof by McCaskill within the significance of Section 1057.4 of the regulations. The fact that he was driving as an independent contractor, as the trial court ruled, of itself has no important significance. The statute, 49 U.S.C. § 304(e) and the regulations based thereon, when applicable, eliminate the common law distinction between an independent contractor and an employee. They create a type of statutory employment under which the franchised carrier becomes responsible for the negligence of the owner-operator at least when he is engaged in the activities of the carrier. (In view of the public policy expressed by the regulations it can be argued persuasively

that when owner-operated equipment is leased by a carrier, the exclusive possession, control and use thereof, and 'complete' assumption of responsibility imposed on the carrier for the 'duration' of the lease, subjects it to liability for the lessor's negligent operation so long as the lessor is on the public highway with the permission of the carrier. Cf. Mellon Nat'l Bank & Trust Co. v. Sophie Lines, Inc., supra, 289 F.2d at pp. 476–477.) 249 A.2d at 589.

Similar determinations that a vehicle was used "in the business of" or "for the benefit of" an ICC carrier when being utilized for personal transport were made in the following cases: Turnbow v. Hayes Freight Lines, Inc., 15 Ill.App.2d 57, 145 N.E.2d 377 (Ill. App.Ct.1957) (driving to a motel after delivery of a load); National Trailer Convoy, Inc. v. Saul, supra (driver on drinking frolic parked on side of road to avoid wife's ire); Felbrant v. Able, supra (driving home after delivery).

In the *Mellon* case, supra, after holding that the tractor was leased to Turner Transfer, Inc.. (Turner) the court found Turner liable for an accident which occurred when the tractor was being used by its owner, Sophie Lines, Inc. (Sophie) to haul lumber for a third corporation. Sophie had no ICC permit, and the court reasoned that absent the Turner lease, the tractor "had not even a semblance of excuse to be on the road." [11] Turner's exclusive control over the driver and vehicle as provided in the ICC lease and its acquiescence in Sophie's practice of shipping for other companies were cited by the court in support of its decision. Such factors are equally applicable to McCormick's relationship to Desmuke and White in the instant case.

In Leotta v. Plessinger, supra, the court reversed the lower court's dismissal of a complaint against an ICC carrier seeking damages for an accident which occurred after delivery had been

---

10. See cases cited in footnote 8.

11. 289 F.2d at 476.

made under a trip lease agreement while the driver was attempting to locate a load for the return trip. Citing the presence on the truck of the ICC carrier's decal, the fact no receipt had been obtained from the tractor's owner acknowledging the vehicle's return, and the carrier's efforts to assist drivers to locate return trips, the court held that the case should be submitted to the jury on the question of the ICC carrier's control and responsibility over the driver's actions. All these factors are present in this case, and unlike the situation in *Leotta,* where the trip lease had terminated by its own terms upon delivery, the McCormick-White lease remained in effect until properly terminated in the manner previously described herein.[12]

■■ It is clear from the above cases that the ICC carrier's liability for equipment and drivers covered by leasing arrangements is not governed by the traditional common law doctrines of master-servant relationships and respondeat superior. Under the broad interpretation of the ICC regulations regarding the issue of whether equipment is being utilized in the business of an ICC carrier, Desmuke's actions on November 3rd were certainly in McCormick's business, and therefore, McCormick would be liable for any accident resulting from Desmuke's negligence. It is obvious that McCormick and Jock were aware of the driver's practice of "hustling" loads, that it was a "normal practice in the business" (Jock, 18), and they apparently did not attempt to prohibit it. (Jock, 18–19).[13] In fact, such exchange of leased personnel and equipment was a prerequisite to the economic success of these independent contractors after the ICC regulations imposed the requirement that each independent contractor lease his vehicle to an ICC authorized carrier under a 30 day or more lease.[14] McCormick assisted and apparently encouraged its drivers to obtain loads with other carriers when no McCormick loads were available. What Desmuke was doing and had done was, if not McCormick's steel hauling business, an incidental function necessary to accomplish the primary purpose of the ICC franchise, namely, to have available the requisite vehicular equipment to carry on its business as a publically regulated motor carrier.[15] To permit McCormick to distinguish between when a driver is dispatched and when he goes on his own and escape liability in the latter situation when McCormick was aware of and tolerated such actions would obviate the entire purpose behind the regulations enacted to remedy the abuses of independent contractors and trip leasing.

Although McCormick was responsible for Desmuke's driving, it was not sued in the state action. Since the applicable

12. When the *Leotta* case was decided, 49 C.F.R. § 1057.4(a) (3) requiring that each tractor be covered by a lease of not less than 30 days length had not yet been enacted.

13. Jock testified that when drivers did leave, particularly if prior to 5 p. m., he might find himself without a driver for McCormick load. Thus, he preferred that drivers remain until 5 p. m. at which time it was the practice for them to attempt to find loads on their own or with Jock's assistance.

14. Since McCormick did not guarantee a load each day, White, Desmuke, and any other independent contractor found it economically imperative to procure loads from other carriers. (White, 19–21). In

accord, *Leotta,* supra, 209 N.Y.S.2d at 308–309, 171 N.E.2d at 457–458. Rosu v. Law, 193 F.2d 894 (3rd Cir. 1952) (Two ICC carriers held liable when driver under trip lease to one but after delivery under said lease obtained return load from second carrier. En route to picking up load, accident occurred, and court upheld jury conclusion that driver on business for both carriers since each had economic benefit in return trip) ; Restatement of Torts, § 428.

15. See cases cited in footnote 8. See also Liberty Mutual Insurance Co. v. McDonald, 97 F.2d 497 (6th Cir. 1938), and Mitchell v. Great Eastern Stages, 140 Ohio St. 137, 42 N.E.2d 771 (Ohio Sup. Ct.1942).

statute of limitations has run,[16] Mc-Cormick cannot now be joined in that action.

The defendants have acknowledged that McCormick had no contractual obligation to indemnify White and Desmuke.[17] However, they have argued that the Cosmopolitan-McCormick insurance contract gives them a right to go against either McCormick or Cosmopolitan since it is a contract of indemnification and the statute of limitations will not commence to run until a final judgment is entered against White and Desmuke. While the insurance contract establishes a right in McCormick of indemnification by Cosmopolitan, it in no way imposes any obligation upon McCormick to indemnify White and Desmuke. Thus, since McCormick has no potential duty of indemnification and was not sued within the statute of limitations period, it can have no final judgment entered against it as a result of the November 3rd accident.

■■ Cosmopolitan contends that it cannot be liable since no judgment can be entered against McCormick. The insurance contract at issue does not, however, limit Cosmopolitan's liability to judgments against McCormick. The pertinent portions of the contract reads as follows:

"   .   .   . In consideration of the premium stated in the policy to which this endorsement is attached, the Company hereby agrees to pay, within the limits of liability hereinafter provided, any final judgment recovered against the insured for bodily injury to or death of any person, or loss of or damage to property of others (excluding injury to or death of the insured's employees while engaged in the course of their employment and property transported by the insured, designated as cargo), resulting from negligence in the operation, maintenance, or use of motor vehicles under certificate of public convenience and necessity or permit issued to the insured by the Interstate Commerce Commission, or otherwise in transportation in interstate or foreign commerce subject to part II of the Interstate Commerce Act, regardless of whether such motor vehicles are specifically described in the policy or not. .   .   ."

Receipts Basis—Truckmen:

"Definition of Insured. As respects such insurance, Insuring Agreement III, Definition of Insured, is replaced by the following:

With respect to the insurance for Bodily Injury Liability and for Property Damage Liability the unqualified word 'insured' includes the named insured and also includes any person while using an owned automobile or a hired automobile and any person or organization legally responsible for the use thereof, provided the actual use of the automobile is by the named insured or with his permission, and any executive officer of the named insured with respect to the use of a non-owned automobile. The insurance with respect to any person or organization other than the named insured does not apply:

(d) With respect to any hired automobile, to the owner or any lessee of such automobile, or to any agent or employee of such owner or lessee, if the accident occurs (1) while such automobile is not being used exclusively in the business of the named insured and over a route the named insured is authorized to serve by federal or public authority, or (2) after arrival of the automobile at its destination under a single-trip contract which does not provide in writing for the return of the automobile;   .   .   ." (T. Exh. #6).

Thus, "insured" includes drivers and owners of leased equipment when that

---

16. 10 Del.C. § 8118, at that time a one year period for actions for personal injuries.

17. Defendants' Post Trial Reply Brief, pp. 9–10.

equipment is being used exclusively in McCormick's business. This provision must be read in light of the ICC regulations, since these regulations have the force and effect of law. *Cox,* supra at 586 of 249 A.2d. As has already been discussed under the ICC regulations, the tractor was being used "in the business" of McCormick at the time of the accident. Therefore, Desmuke and White are "insured" within the meaning of the Cosmopolitan insurance contract and Cosmopolitan would be liable to pay any final judgment entered against either of them.[18]

■ In addition, since under the lease McCormick assumed full and exclusive possession, control and responsibility for the vehicle, Desmuke was operating as a "statutory employee" of McCormick, see Brannaker v. Transamerican Freight Lines, Inc., 428 S.W.2d 524, 535 (Mo.Sup.Ct.1968) and McCormick had the right and responsibility to exercise exclusive control over him. American Transit Lines v. Smith, supra, 246 F.2d at 88, and *Cox,* supra.[19] See also Commercial Standard Insurance Co. v. Robertson, 159 F.2d 405, 409–410 (6th Cir. 1947).

■■ The failure to join Cosmopolitan in the State Court action does not preclude these defendants from requiring Cosmopolitan to pay any final judgment entered against White or Desmuke. The federal rule governing ICC authorized interstate carriers insurance requirements, 49 U.S.C. § 315, and the ICC regulations adopted thereunder, 49 C.F.R. § 1043.1, as well as the insurance contract at issue here, establish an obligation upon the insurer to pay any final judgment against the insured. This provision has been interpreted to insulate the insurer from suit until such a final judgment is obtained against the insured.[20] Under these circumstances, the statute of limitations on Cosmopolitan's obligations will not commence to run until a final judgment is rendered in the state court suit. Since the ICC regulations were enacted for the benefit of the public, *Cox,* supra, and *Mellon,* supra, the ICC insurance requirements referred to above create a right in the plaintiffs in the state court action as third party beneficiaries of the Cosmopolitan-McCormick insurance contract. See Grier v. Tri-State Transit Co., supra; see generally 17 Am.Jur.2d, Contracts, §§ 302–304, 313.

Since McCormick was not joined in the state action and the statute of limitations has run, McCormick may not now be held liable for any judgment arising out of the November 3rd accident.

Under its insurance contract with McCormick, Cosmopolitan will be liable to pay any final judgment rendered against White or Desmuke in the state court action.

Submit order in accordance herewith.

---

18. The Court is of the opinion that the words "exclusively in the business of the named insured" do not, in light of the ICC regulations, establish a more restrictive standard governing coverage for liability of the driver and owner than was utilized in the previously cited cases discussing an ICC authorized carrier's liability. *Cox,* supra; *Mellon,* supra; etc.

19. See also 49 C.F.R. § 1057.4(a) (4).

20. Tucker v. Casualty Reciprocal Exchange, 40 F.Supp. 383 (N.D.Ga.1941); Grier v. Tri-State Transit Co., 36 F.Supp. 26 (W.D.La.1940).