Roberta R. **WELLMAN** and Ward W. Wellman, Appellees,

v.

**LIBERTY MUTUAL INSURANCE COMPANY, Appellant.**

No. 73-1778.

United States Court of Appeals, Eighth Circuit.

Submitted March 11, 1974.

Decided May 14, 1974.

William P. Sanford, Springfield, Mo., for appellant.

B. H. Clampett, Springfield, Mo., for appellees.

Before GIBSON, BRIGHT and STEPHENSON, Circuit Judges.

BRIGHT, Circuit Judge.

Appellant-Liberty Mutual Insurance Company wrote a comprehensive combination insurance policy covering both automobile and general liability on its named insured, Morgan Drive-Away, Inc. (Morgan), of Elkhart, Indiana, a common carrier regulated by the Interstate Commerce Commission. On December 19, 1969, a truck leased to Morgan and driven by its owner, Corrie Mitchell, Jr., collided with an automobile driven by Roberta R. Wellman near Lebanon, Missouri, while Mitchell was returning from delivering a load of cargo for Morgan. On this return trip and at the time of the accident, Mitchell was actually hauling a load of freight under contract with a third party, Illinois Machinery Transport, Inc. (IMT),[1] without the express knowledge or approval of Morgan.

Mrs. Wellman sustained very severe injuries, including the loss of a leg, as a result of the accident. She and her husband brought an action in the Missouri state courts against Morgan, Mitchell, and IMT. Plaintiffs later dropped their suit against Morgan, but recovered a very substantial default judgment in the sum of $301,971.27 against Mitchell and IMT. Liberty Mutual defended Morgan but not Mitchell or IMT in the state court. Thereafter, the Wellmans brought this proceeding in the United States District Court for the Western District of Missouri, seeking to satisfy the default judgment from proceeds of the liability insurance policies issued by Liberty Mutual to Morgan.[2]

The district court held that the Liberty Mutual policies afforded coverage both to Mitchell and to IMT and entered judgment for the full amount in favor

---

1. IMT operated as a broker, engaging independent truckers to haul motor freight at less than common carrier rates and without I.C.C. authority.

2. Liberty Mutual actually issued two policies to Morgan: a primary liability policy and an "umbrella" policy. Liberty Mutual concedes that the coverage under the umbrella policy was co-extensive with that of the primary policy as to coverage provisions, adding only additional monetary limits. For the purpose of this case we need only consider the coverage provisions extended by the primary policy.

of the Wellmans. Liberty Mutual brings this timely appeal. Our jurisdiction rests on diversity of citizenship and the requisite amount in controversy.

We have carefully examined the insurance policies here in question and the authorities submitted by appellant. We cannot agree with the district court's conclusion that the policy language includes coverage for Mitchell and IMT under such circumstances as these. Accordingly, we reverse the judgment.

We adopt the following findings of fact by the district court from its unpublished memorandum opinion:

Morgan Drive-Away, Inc. (freight division) is a common carrier regulated by the Interstate Commerce Commission and numerous state regulatory agencies, including the Missouri Public Service Commission. It is a licensed special carrier which hauls or tows trailers, mobile homes and component parts of complete houses. Its principal offices and central dispatching office are located in Elkhart, Indiana.

Morgan owns a substantial number of trailers which it uses in its operation. In addition, it leases the tractors and trailers of others. On May 15, 1969, Morgan and Corrie Mitchell, Jr. entered into an "Equipment Lease" under which Morgan assumed the "possession, control and use" of a tractor-trailer owned and operated by Mitchell. Mitchell paid for all of his own expenses on his trips for Morgan, and for the upkeep and maintenance of the equipment, as well as his license plates, tags, stickers, personal property taxes and insurance for when his vehicle was being operated unladen. Mitchell received no salary, but earned 75 per cent of the gross freight revenues generated by the use of his tractor-trailer. No withholding taxes were collected or Social Security payments deducted from the amounts which Mitchell received.

Following the execution of the Equipment Lease, the ICC Certificate or Permit Legend, as well as the Missouri Public Service Certificate or Permit Legend, of Morgan were placed upon and displayed on the tractor of Mitchell, and remained on the tractor until the lease was cancelled in January, 1970.

On December 13, 1969, Mitchell was directed by Morgan to pick up cargo at a point near Houston, Texas for delivery to the consignee at Elgin, Illinois. Delivery was made on December 16, 1969. After notifying Morgan of the delivery, Mitchell sought a return load from Morgan's central dispatcher; but none was available at that time. Mitchell called the dispatcher several more times on December 16 and 17, but there continued to be no loads available for a return trip. Mitchell also called other dispatchers, but was unable to secure a load. On December 17, Mitchell found a penciled note in the office of a truck stop where he was staying, directing him to pick up a load at Illinois Machinery Transport Company ("Illinois Machinery") in Calumet City, Illinois for delivery in Texas and Oklahoma. Although Mitchell assumed that the note was from Morgan's central dispatcher, there is no evidence that it was in fact a direction from Morgan.

The load which Mitchell picked up at Illinois Machinery consisted of a large exhaust fan, two centerless grinders, and bridge bolts and nuts. None of these items were within Morgan's ICC hauling and authorization.

As a general rule, Morgan acquiesced in the practice of allowing its drivers to "trip-lease"; that is, to haul cargoes for other companies or carriers on return trips when Morgan had no loads available. Morgan required that the driver receive permission for trip-leasing through its central dispatcher; and that the company to whom its drivers were trip-leased be authorized as carriers by the ICC, have an operating agreement with Morgan, and be on an approved list set up by Morgan. Illinois Machinery

was not an ICC authorized carrier, did not have an operating agreement with Morgan, nor was it on Morgan's approved list. Mitchell had, with Morgan's approval, trip-leased one previous time.[3]

On December 19, 1969, while Mitchell was on his return trip, he collided with an automobile driven by plaintiff Roberta Wellman near Lebanon, Missouri. Ms. Wellman sustained serious injuries, including the loss of a leg. Mitchell's tractor-trailer was severely damaged, and the cargo which he was hauling was also damaged. The accident occurred on a route where Morgan was generally authorized to travel by the ICC and Missouri Public Service Commission. At the time of the accident, Morgan's ICC permit and Missouri Public Service Commission placard were displayed on Mitchell's tractor.

Mitchell notified Morgan of his accident shortly after it occurred. Morgan notified Liberty of the accident on December 24, 1969. A written report taken by a Morgan employee from Mitchell over the telephone was given to Liberty. Neither Mitchell nor Illinois Machinery notified the defendant of the accident. The cargo loss suffered in the collision was paid for by Home Indemnity Insurance Company, the insurer of Illinois Machinery.

In July, 1971, plaintiffs filed suit in the Circuit Court of Laclede County, Missouri, naming as defendants Corrie Mitchell, Jr., Illinois Machine Transport Co. and Morgan Drive-Away, Inc. The complaint alleged, inter alia, that Mitchell was acting as the agent, servant and employee of both Morgan and Illinois Machine. After being served with a summons and copy of the complaint, Morgan notified Liberty and sent the suit papers to the defendant. Neither Mitchell (who stated that he had thrown his suit papers away) nor Illinois Machine notified or transmitted the suit papers to Liberty.

Defendant employed an attorney to represent Morgan in the action, and an answer on behalf of Morgan was filed. Liberty made a deliberate choice not to defend the other defendants in the action on the belief that the others were not insureds under either of its polices. Neither Mitchell nor Illinois Machine filed an answer to the action in Circuit Court.

Prior to the institution of the damage suit in Circuit Court, Liberty made little effort to investigate the facts of the accident and the possible extent of its coverage by contacting Mitchell and Illinois Machinery. After suit was filed in July, 1971, Liberty discovered that Illinois Machinery (also called by various other names, including J&R or J&M Transport Company) had discontinued business, and they were unable to locate the former officers of the company. Nor did they contact their named insured, Morgan, to determine what information had been given to Morgan by Mitchell other than the telephoned report.

On October 4, 1971, plaintiffs dismissed their action against Morgan without prejudice. On that same day, a default judgment was entered against Mitchell and Illinois Machine. Damages were assessed in favor of Roberta Wellman in the amount of $230,000, and in favor of Ward Wellman in the amount of $71,971.27.

Appellant-Liberty makes the same contentions in this court as it did in the district court, and, additionally, contends that the Wellmans failed to show the reasonableness of the amount of the judgments which were obtained in state court. The crucial issue in this case, however, is whether the insurance policy

3. At the trial it appeared that Morgan drivers were also required to contact the central dispatcher at Elkhart, Indiana, when they had completed their delivery to obtain a return load if one were available.

covers owner-operator, Mitchell and broker-IMT.

The primary Liberty Mutual policy contains two parts. Only Part II is pertinent to our present inquiry.[4] Part II, entitled "Comprehensive Automobile Liability Insurance," specifically relates to the operation of automobiles[5] and affords the following liability coverages:

COVERAGE C—BODILY INJURY LIABILITY

COVERAGE D—PROPERTY DAMAGE LIABILITY

The company will pay on behalf of the insured all sums which the insured shall become legally obligated to pay as damages because of

Coverage C. bodily injury or

Coverage D. property damage

to which this insurance applies, caused by an occurrence and arising out of the ownership, maintenance or use, including loading and unloading, of any automobile * * * [.]

Part II further designates those persons entitled to insurance protection in the following pertinent language:

PERSONS INSURED

Each of the following is an insured under this insurance to the extent set forth below:

(a) the named insured;

(b) [inapplicable]

(c) any other person while using an owned automobile or a hired automobile with the permission of the named insured, provided his actual operation or (if he is not operating) his other actual use thereof is within the scope of such permission, but with respect to bodily injury or property damage arising out of the loading or unloading thereof, such other person shall be an insured only if he is:

(1) a lessee or borrower of the automobile, or

(2) an employee of the named insured or of such lessee or borrower;

(d) any other person or organization but only with respect to his or its liability because of acts or omissions of an insured under (a), (b) or (c) above.

None of the following is an insured:

* * * * * *

(ii) The owner * * * of a hired automobile or the owner of a non-owned automobile, or any agent or employee of any such owner * * *.

The terms "hired automobile" and "non-owned automobile" carry specific definitions:

"hired automobile" means an automobile not owned by the named insured which is used under contract in behalf of, or loaned to, the named insured, provided such automobile is not owned by or registered in the name of (a) a partner or executive officer of the named insured or (b) an employee or agent of the named insured who is

---

4. Part I is entitled "Comprehensive General Liability Insurance" and contains the following pertinent language pertaining to liability coverage:

COVERAGE A—BODILY INJURY LIABILITY

COVERAGE B—PROPERTY DAMAGE LIABILITY

The company will pay on behalf of the insured all sums which the insured shall become legally obligated to pay as damages because of

Coverage A. bodily injury or

Coverage B. property damage

to which this insurance applies, caused by an occurrence * * *.

Part I of the policy specifically excludes any coverage for "bodily injury or property damage arising out of the ownership, maintenance, operation, use, loading or unloading of * * * any automobile * * * owned or operated by or rented or loaned to the name insured." Clearly no coverage is afforded to Wellmans' claim under this part of the policy.

5. "Automobile" is defined as "a land motor vehicle, trailer, or semi-trailer designed for travel on public roads."

granted an operating allowance of any sort for the use of such automobile;

\*　\*　\*　\*　\*　\*

"non-owned automobile" means an automobile which is neither an owned automobile nor a hired automobile.

■ The trial court correctly observed that Mitchell's operation of the truck leased by Morgan—although operated on a journey not specifically authorized by Morgan—would be considered subject to Morgan's control, direction, and authority. So long as the truck carried Morgan's I.C.C. permit as well as that of the Missouri Public Service Commission, Morgan would be liable to third parties injured through the operation of the truck under a theory of vicarious liability derived from the purpose of the Interstate Commerce Act and the language of I.C.C. regulation 49 C.F.R. § 1057.4. Mellon National Bank & Trust Co. v. Sophie Lines, Inc., 289 F.2d 473, 478 (3d Cir. 1961); Cosmopolitan Mutual Insurance Company v. White, 336 F.Supp. 92, 99 (D.Del.1972); Cox v. Bond Transportation, Inc., 53 N. J. 186, 249 A.2d 579, 589 (1969).

■ We think that the reasoning of the foregoing cases would justify construing the "Persons Insured" section of Part II of the policy to extend coverage to the vehicle owner-operator, Mitchell. So long as the lessee-motor carrier's I.C.C. permit numbers were displayed on the vehicle, Mitchell was, as a matter of law, operating the vehicle within the scope of the insured's permission, and, under these circumstances, the "Persons Insured" provisions would cover him. The exclusion in section (ii) of "the owner \* \* \* of a hired automobile" would not bar coverage to an owner-operator since he would be protected under subdivision (c) as a user whose "actual operation \* \* \* is within the scope of such permission."

This reasoning, however, is insufficient to establish coverage for the driver-Mitchell and his shipping broker-IMT

because of important modifications of coverage contained in the "Truckmen—Form A" endorsement.[6] This endorsement modified the coverage as follows:

It is agreed that the insurance applies with respect to any owned automobile, hired automobile and, while being used in the business of the named insured, non-owned automobile, subject to the following additional pertinent provisions:

\*　\*　\*　.　\*　\*　\*

(b) Except with respect to the named insured or an employee thereof, but subject otherwise to the "Persons Insured" provision, the insurance does not cover as an insured any person or organization, or any agent or employee thereof, engaged in the business of transporting property by automobile for the named insured or for others under any of the following conditions:

(1) If the bodily injury or property damage occurs while such automobile is not being used exclusively in the business of the named insured and over a route the named insured is authorized to serve by federal or public authority, but this limitation shall not apply to an automobile while en route, at the request of the named insured, to engage in such exclusive use and not transporting property for others;

\*　\*　\*　\*　\*　\*

provided, however, a driver or other person furnished to the named insured with an automobile hired by the named insured shall be deemed not to be an employee of the named insured.

\*　\*　\*

(d) The insurance does not cover as an insured, the owner or any lessee (of whom the named insured is a sub-lessee) of a hired automobile, or any agent or employee of such owner or lessee, if the

---

**6.** Although the heading of "Truckmen—Form A" refers to Coverage A and B of Part I, it is clear from internal indicia that the endorsement actually applies to Coverage C and D of Part II, the part of the policy relevant here.

bodily injury or property damage occurs:

(1) while the automobile is not being used exclusively in the business of the named insured and over a route the named insured is authorized to serve by federal or public authority; but this limitation shall not apply to an automobile while en route, at the request of the named insured, to engage in such exclusive use and not transporting property for others * * * *.[7]

■ Although the concept underlying Cox v. Bond Transportation, Inc., 53 N. J. 186, 249 A.2d 579 (1969), and similar cases may justify extending the liability coverage of an I.C.C. certificate motor carrier to the owner-operator as a "statutory" employee of the motor carrier under a broad "Persons Insured" provision such as in Part II of the Liberty Mutual policy, we cannot carry this reasoning over to extend the policy coverage to the owner-driver in this case because of the limiting language of coverage contained in the "Truckmen—Form A." endorsement. Paragraph (b) of that endorsement specifically declares that "a driver or other person furnished to the named insured with an automobile hired by the named insured shall be deemed not to be an employee of the named insured." Thus, an owner-operator, though he may be deemed a "statutory" employee for liability purposes, is not classified as an employee of the insured for insurance purposes.

Here, Mitchell, as a nonemployee under the policy, was operating and using the vehicle at the time of the accident on the business of IMT, a third party, not in the exclusive business of the named insured. As a result, the specific language of paragraphs (b)(1) and (d)(1)

of "Truckmen—Form A," stipulating that the use of the hired automobile be "exclusively in the business of the named insured," requires that we construe the policy as affording no liability coverage to owner-operator, Mitchell, or to IMT.

■ It is true that Mitchell may be said to have operated the vehicle on a dual purpose. At the same time that Mitchell was using his vehicle for IMT under their freight manifest, he was using the vehicle for Morgan in a general way because of the existence of the vehicle lease and display of permit numbers. But a dual use is not a basis to extend the policy coverage to third parties or to an owner-operator in light of the express requirement that the motor vehicle be "used exclusively in the business of the named insured."

The district court and appellees rely on Cosmopolitan Mutual Insurance Company v. White, 336 F.Supp. 92 (D.Del. 1972), as support for upholding the district court's theory of coverage. There, the policy in question contained exclusionary provisions almost identical to those in the instant case. On a set of facts similar to those in the case at bar, the *Cosmopolitan* court held that the operator of a leased truck was using the vehicle "exclusively in the business of the named insured" within the meaning of the insurance policy, even though the return hauling job during which the accident occurred was unauthorized by the I.C.C. carrier. The court reasoned as follows:

Under the broad interpretation of the ICC regulations regarding the issue of whether equipment is being utilized in the business of an ICC carrier, [driver] Desmuke's actions on November 3rd were certainly in [I.C.C. carrier] McCormick's business, and therefore,

---

7. The definition of "hired automobile" was amended by the endorsement as follows:

(c) When used in reference to the insurance under this endorsement, the definition of "hired automobile" is amended to read:

"hired automobile" means an automobile not owned by the named insured which is used under contract in behalf of or loaned to, the named insured, other than a private passenger automobile owned by or registered in the name of an agent or employee of the named insured or a member of the same household as such named insured, agent, or employee.

McCormick would be liable for any accident resulting from Desmuke's negligence. It is obvious that McCormick and Jock [McCormick's dispatcher] were aware of the driver's practice of "hustling" loads, that it was a "normal practice in the business" (Jock 18) and they apparently did not attempt to prohibit it. (Jock 18) In fact, such exchange of leased personnel and equipment was a prerequisite to the economic success of these independent contractors after the ICC regulations imposed the requirement that each independent contractor lease his vehicle to an ICC authorized carrier under a 30 day or more lease. McCormick assisted and apparently encouraged its drivers to obtain loads with other carriers when no McCormick loads were available. What Desmuke was doing and had done was, if not McCormick's steel hauling business, an incidental function necessary to accomplish the primary purpose of the ICC franchise, namely, to have available the requisite vehicular equipment to carry on its business as a publically regulated motor carrier. To permit McCormick to distinguish between when a driver is dispatched and when he goes on his own and escape liability in the latter situation when McCormick was aware of and tolerated such actions would obviate the entire purpose behind the regulations enacted to remedy the abuses of independent contractors and trip leasing. [336 F.Supp. at 99 (footnotes omitted).]

The court went on to hold:

Thus, "insured" includes drivers and owners of leased equipment when that equipment is being used exclusively in McCormick's business. This provision must be read in light of the ICC regulations, since these regulations have the force and effect of law. *Cox*, supra at 586 of 249 A.2d. As has already been discussed under the ICC regulations, the tractor was being used "in the business", of McCormick at the time of the accident. Therefore, Desmuke and White are "insured" within the meaning of the Cosmopolitan insurance contract and Cosmopolitan would be liable to pay any final judgment entered against either of them. [336 F.Supp. at 100–101 (footnote omitted).]

We cannot accept this logic as it relates to insurance coverage. The fact that an owner-operator displays the carrier's permit number while hauling an unauthorized load for a company other than the I.C.C. carrier does not make the trip one "exclusively in the business" of the insured, although the insured motor carrier remains liable to third parties during the entire term of the vehicle lease. The language of the insurance policy must be given its ordinary meaning unless good reason appears for doing otherwise. The relevant I.C.C. regulation on insurance, 49 C.F.R. § 1043,[8] contains no provision which would require a motor carrier specifically to carry insurance affording liability coverage for judgments rendered solely against an owner-operator of a vehicle leased to the motor carrier. In the absence of such a provision, we think it unreasonable to apply 49 C.F.R. § 1057.-4 [9] and the public policies of the Inter-

---

8. 49 C.F.R. § 1043.1 states in relevant part: [N]o common or contract carrier * * * shall engage in interstate or foreign commerce, and no certificate or permit shall be issued to such a carrier or remain in force unless and until there shall have been filed with and accepted by the Commission a surety bond, certificate of insurance, proof of qualifications as a self-insurer, or other securities or agreements * * * conditioned to pay any final judgment recovered against such motor carrier for bodily injuries to or the death of any person resulting from the negligent operation, maintenance or use of motor vehicles in transportation * * *.

9. 49 C.F.R. § 1057.4 provides in part: [A]uthorized carriers may perform authorized transportation in or with equipment which they do not own only under the following conditions:
(a) *Contract requirements*. The contract, lease, or other arrangement for the use of such equipment:
* * * * *

state Commerce Act, as a gloss to the exclusionary provisions of the insurance policy in this case. We do not think that such broad coverage could reasonably have been contemplated by the parties when they formed their insurance contract. Nor should we make the unwarranted assumption that the insurer and the insured somehow intended the apparent and obvious meaning of the endorsement to be inoperative and to be controlled instead by an I.C.C. regulation which in no way relates to or binds insurance companies. It is one thing to hold that a motor carrier is absolutely liable—based on the Interstate Commerce Act—for injuries resulting from the negligent operation of vehicles leased to it, but it seems an unjustified and illogical leap to hold that an insurance company—whose sole obligation rests on contract—should be bound to pay a judgment for others who are not mentioned in the I.C.C. insurance regulation (49 C.F.R. § 1043.1), and who are specifically excluded by the language of the policy.

It is true that the cases clearly hold that I.C.C. regulations require that the motor carrier operating leased equipment be held liable to the public for negligent operation of leased vehicles. *See, e. g.*, Mellon National Bank & Trust Co. v. Sophie Lines, Inc., 289 F.2d 473 (3d Cir. 1961). In that regard, Morgan properly could have been held liable to the Wellmans in the original state court proceeding if Mitchell were proved negligent. Had the Wellmans obtained a state court judgment against Morgan,

the result in this case would have been different, for the insurance policy would clearly have covered Morgan as the "named insured" even though its liability would be vicarious and statutorily derived.

■ Appellees, however, after initially including the common carrier, Morgan, in their state court action, elected voluntarily to dismiss the action against Morgan and to continue it only against the defaulting defendants, Mitchell and IMT. Since there was no judgment of liability against Morgan, the regulations which, on the one hand, require insurance coverage for judgments against the carrier and, on the other, impose legal responsibility upon the motor carrier for the operation of leased vehicles, may not be read into the insurance policy to impose liability upon the insurer of the motor carrier in contravention of the precise, express terms of the policy.

We think it highly unfortunate that the I.C.C. has not established a clearer requirement that motor vehicle common carriers' liability policies, filed pursuant to the Interstate Commerce Act, must extend coverage to the owner-operator of a leased vehicle to the same extent as that afforded the lessee-common carrier. Under such a requirement, insurance coverage would extend to cover the vehicle driver at all times. But we emphasize that this insurance coverage problem would not arise where a plaintiff presses his suit against the I.C.C. carrier whose permit numbers are carried on the truck at the time of the accident.[10]

Reversed.

---

(4) *Exclusive possession and responsibilities.*
Shall provide for the exclusive possession, control, and use of the equipment, and for the complete assumption of responsibility in respect thereto, by the lessee for the duration of said contract, lease or other arrangement * * *.

10. Here, plaintiffs' counsel may have felt tactically that his best chance for an ultimate monetary recovery on behalf of his clients lay in obtaining a default judgment against the nonanswering defendants, Mitchell and IMT, and thereafter attempting

collection of that judgment against the insurer of Morgan. This procedure required a trial only of the insurance coverage issue. To have continued the case against the I.C.C. carrier and to have effected recovery, the Wellmans faced a most difficult task of establishing legal liability against Morgan in the face of a report of an accident prepared by the Missouri State Highway Patrol which indicated that Mrs. Wellman, driving southbound on a county road, pulled out from a stop sign directly into the path of Mitchell's westbound truck, operating on a through highway.