PROGRESSIVE COUNTY MUTUAL IN-SURANCE COMPANY and Progressive Casualty Insurance Company, Appellants,

v.

Eugene Vincent CARWAY, Appellee/Cross-Appellant.

No. 14–96–00142–CV.

Court of Appeals of Texas, Houston (14th Dist.).

June 26, 1997.

Rehearing Overruled Sept. 25, 1997.

Arthur M. Glover, Adam P. Criaco, James B. Lewis, Houston, for appellants.

David F. Webb, Diane Guariglia, Jason Edward Wilson, Houston, for appellee.

Before YATES, HUDSON and FOWLER, JJ.

## OPINION

FOWLER, Justice.

In this case the primary issue we must decide is whether an insurance company that sold a liability policy to a motor carrier is liable for a judgment entered against the motor carrier's employee/driver even though the driver was not a named insured under the policy issued to the *motor carrier*. The trial court decided the insurance coverage dispute on opposing cross-motions for summary judgment. It granted one summary judgment in favor of the plaintiff, Carway, holding that policy No. 7610108–1 of Progressive Casualty Insurance Company ("Progressive") provided coverage to the driver and that the policy's notice and cooperation provisions were not applicable, enforceable, or breached. Progressive appeals the granting of this motion. The second cross-motion for summary judgment was granted in favor of the insurance companies, Progressive and Progressive County Mutual Insurance Company ("PCMIC"), holding that (1) PCMIC demonstrated as a matter of law there was no insurance policy covering Carway's assigned claims, and (2) PCMIC and Progressive demonstrated the applicable date for the statute of limitations was two-years and therefore Carway's causes of action for breach of the duty to defend and failure to *indemnify* were time-barred. Carway appeals the granting of Progressive's and PCMIC's motion for summary judgment. We reverse the trial court's decision to hold Progressive liable to Carway on his contract claim and render judgment that Carway take nothing, and we affirm the trial court's decision that PCMIC was not liable on Carway's common law and statutory bad faith claims.

## FACTS AND PROCEDURAL HISTORY

On April 14, 1989, Stephen L. Rutledge ("Rutledge"), an employee of PST Vans, Inc. ("PST"), was driving a tractor trailer when it collided with a car driven by Carway. Car-

way sustained severe injuries in the accident. Rutledge was acting in the scope of his employment for PST while driving a tractor PST leased from Great Western Leasing Company, Inc., ("Great Western"). PST had a Motor Carriers Liability Policy from Progressive which was in effect at the time of the accident.

On March 6, 1991, Carway filed his first suit, styled *Eugene V. Carway v. Pacific States Transp., Inc., Greater Western Leasing Company, Inc., and Stephen L. Rutledge,* Cause No. 91–09334, in the 80th Judicial District of Harris County, Texas. Progressive retained counsel to defend both PST and Great Western.

Carway served both Great Western and PST, and counsel retained by Progressive filed answers for them in 1991. Rutledge, however, was much more difficult to locate, and was not served with the Plaintiff's Original Petition until July of 1992. Having heard that Rutledge was served, Progressive attempted to contact him. Because the company did not have Rutledge's telephone number, it sent him a certified letter on August 17, 1992, giving him the name and telephone number of the law firm handling the suit and asking him to contact the firm so an answer could be provided for him. The letter also warned that Progressive could deny coverage if he did not forward the service papers to the firm.

Rutledge never answered the suit and Progressive chose not to file an answer for him. So, on August 17, 1992, Carway was granted an interlocutory default judgment against Rutledge for $1.5 million plus interest at ten percent per annum. In September 1992, Progressive denied coverage to Rutledge for failing to report the lawsuit or cooperate with efforts to determine if he had been served with a suit in connection with the accident.[1] In October of 1992, Rutledge assigned to Carway the right to sue PST, Great Western, and several others not involved in this suit for their bad faith in the first Carway suit. Several years later, in April of 1995, Rut-

ledge assigned to Carway any claims he had against PCMIC, Progressive and PST's legal counsel for any sums due and owing to him and for causes of action arising out of the handling of the Carway lawsuit, including claims for failure to defend and properly indemnify.

Carway sued Progressive for the benefits of the policy covering PST, and allegedly covering Rutledge at the time of the accident, and for violations of the DTPA. Carway then moved for partial summary judgment, alleging Rutledge was covered under PST's insurance policy, and therefore, Carway was entitled to the proceeds of the policy to cover the judgment he obtained against Rutledge. As part of the summary judgment evidence, Carway attached, among other things, (1) a copy of the policy and endorsements covering PST, and (2) PST's admission from the original suit against PST and Rutledge admitting Rutledge was acting within the scope of his employment when the accident occurred.

Progressive and PCMIC filed their own joint motion for summary judgment claiming (1) the two-year statute of limitations barred Carway's claims for breach of duty to defend and failure to indemnify, (2) Rutledge's assignment did not convey to Carway the right to sue PCMIC or Progressive, (3) Rutledge was not covered by the Progressive policy covering PST, and (4) Rutledge breached the conditions precedent to coverage under the Progressive policy.

After considering both motions, the trial court entered a final judgment in favor of Carway and against Progressive on the coverage issue, but held PCMIC had no policy covering PST. The court also found in favor of Progressive on the statute of limitations issue, finding Carway's claims for the duty to defend and failure to indemnify were barred. Finally, the court also held that the assignment was valid and that Rutledge's claims were not barred by any conditions contained in the policy.

---

**1.** Sometime after the default judgment, PST filed a suggestion of bankruptcy in the state court, which stayed the entire case until Carway requested that the case against Rutledge be al- lowed to proceed. The cause of action against Rutledge was reactivated in early January of 1995.

## STANDARD OF REVIEW

The standard of review to be followed when reviewing a summary judgment is well-established:

1. The movant for summary judgment has the burden of showing there is no genuine issue of material fact and that it is entitled to judgment as a matter of law;

2. In deciding whether there is a disputed material fact issue precluding summary judgment, evidence favorable to the non-movant will be taken as true; and

3. Every reasonable inference must be indulged in favor of the non-movant and any doubts resolved in its favor.

*Nixon v. Mr. Property Management Co.,* 690 S.W.2d 546, 548–49 (Tex.1985); *Karl v. Oaks Minor Emergency Clinic,* 826 S.W.2d 791, 794 (Tex.App.—Houston [14th Dist.] 1992, writ denied). When both parties file competing motions for summary judgment and one is granted and the other denied, the reviewing court will determine all issues presented, including the order denying the losing party's motion. *Jones v. Strauss,* 745 S.W.2d 898, 900 (Tex.1988). Where, as here, the summary judgment order does not specify the grounds upon which summary judgment was granted, the reviewing court will affirm the judgment if any theories advanced in the motions are meritorious. *State Farm Fire & Casualty Co. v. S.S.,* 858 S.W.2d 374, 380 (Tex.1993); *Carr v. Brasher,* 776 S.W.2d 567, 569 (Tex.1989).

## CARWAY'S MOTION FOR SUMMARY JUDGMENT

We begin with Carway's motion for summary judgment. Progressive asserts in its sole point of error that the trial court erred in denying its motion for summary judgment and in granting Carway's cross-motion for summary judgment because Progressive proved Rutledge was not covered by Progressive's policy. The parties do not dispute that Rutledge was not a named insured under Progressive's policy even though he was

in the course and scope of his employment with PST at the time of the accident. They do, however, disagree on whether (1) the regulatory filings created coverage; (2) various endorsements to the policy created coverage; and (3) the policy's notice and cooperation provisions were applicable, enforceable, and breached.

### a. Did The Texas Motor Carrier Act Create Coverage?

We begin with the issue of statutorily created coverage. As noted, Rutledge was not a named insured in the Declarations portion of the policy and did not otherwise fall within the definition of insured since the policy did not include an employee as an insured. Nevertheless, Carway maintains Rutledge became an insured because (a) Progressive's policy contained an endorsement stating the policy was in compliance with state law; (b) state law requires the motor carrier to have insurance; and (c) Rutledge falls within the definition of motor carrier.

Our focus then, turns to Progressive's endorsements and Texas law. At the time of the accident, both PST and Great Western were interstate motor carriers required by Texas and federal law to obtain either a permit issued by the Texas Railroad Commission ("TRC") or the Interstate Commerce Commission ("ICC").[2] PST obtained a TRC permit number and an ICC docket-permit number. In addition, before PST could legally conduct motor carrier activities, state and federal law required PST to obtain a motor carrier liability policy to satisfy any final judgment taken against it for injuries arising from the negligent maintenance, use or operation of one of its vehicles under permit. *See* 49 U.S.C.A. § 10927(a)(1) (1978); TEX.REV.CIV. STAT. ANN. art. 911b, § 13 (Vernon 1964). PST obtained the liability policy at issue from Progressive to comply with these laws.

Under federal law, each motor carrier's liability policy must contain an endorsement amending the policy to provide insurance coverage in accordance with state law. *See*

---

**2.** On December 29, 1995, Congress abolished the I.C.C. and transferred its remaining functions to the Department of Transportation and the Sur-

face Transportation Board. *See* Pub.L.No. 104–88, 109 Stat. 803; 49 U.S.C. 701 note (1996).

49 U.S.C.A. § 10927(a)(1) (1978). This endorsement is known as Endorsement F and was contained in the policy issued by Progressive to PST.

The certification of the policy, as proof of financial responsibility under the provisions of any State motor carrier law or regulations promulgated by any State Commission having jurisdiction with respect thereto, amends the policy to provide insurance for automobile bodily injury and property damage liability in accordance with the provisions of such law or regulations to the extent of the coverage and limits of liability required thereby.

Though federal law mandates that each motor carriers' liability policy contain an Endorsement F, Texas law requires a motor carrier to prove it has complied with federal law by filing Form E with the TRC. *See* Tex.Rev.Civ. Stat. Ann. art. 911b, § 13c (Vernon 1994).[3] This filing is required by the Texas Motor Carrier Act ("MCA"), which states:

[B]efore any motor carrier may lawfully operate under such permit or certificate as the case may be, such motor carrier shall file with the Commission bonds and/or insurance policies ... [that] will pay to the extent of face amount of such insurance policies and bonds, all judgments which may be recovered against the motor carrier ..., based on claims for loss or damages from personal injury or loss of, or injury to property claims for loss or damages from personal injury or loss of, or injury to property occurring during the term of said bonds and policies arising out of the actual operation of such motor carrier ...

*Id.* (emphasis added). Thus, by adding Endorsement F to the policy, Progressive agreed to amend the policy to provide the required coverage for a motor carrier. By filing Form E with the TRC, PST certified to the Texas Railroad Commission it had the required insurance to cover personal injury or property damage arising out of the operation of its business.

Clearly, under Texas and federal law, the motor carrier must have insurance coverage. But, as we have stated, the Progressive policy does not specifically provide coverage for Rutledge. Therefore, the only way to find coverage for him is if the *statute requires* him to be covered by the Progressive policy. Carway argues that Rutledge falls within the definition of a motor carrier, and therefore, is covered by the Progressive policy "because he was operating the vehicle on Texas roadways under PST's permit number." Carway's real argument seems to be this: (1) Rutledge is a motor carrier under the MCA; (2) a motor carrier must have insurance in Texas to operate; and (3) therefore, Rutledge is covered by the Progressive policy. We disagree with the proposition that Rutledge is a motor carrier, but even if we were to hold he is, we do not agree that Rutledge is automatically covered by the Progressive policy.

First, we consider whether Rutledge is a motor carrier. The Texas (MCA) defines the term "motor carrier" as

... any *person,* firm, corporation, company, co-partnership, association or joint stock association, and their lessees, receivers, or trustees appointed by any Court whatsoever owning, controlling, managing, *operating* or causing to be operated *any motor propelled vehicle used in the transporting of property for compensation or hire over any public roadway in this state* ...

Tex.Rev.Civ. Stat. Ann. art. 911b, § 1(g) (Vernon 1964) (emphasis added).

The standards by which we interpret a statute are clear. We are to ascertain the intent of the legislature "as expressed in the language of that statute." *State v. Terrell,* 588 S.W.2d 784, 786 (Tex.1979). "In construing a statute, we are to give effect to the plain meaning of the statute, so long as the statute is clear and unambiguous." *State v. Norton,* 899 S.W.2d 303, 304 (Tex.App.—Houston [14th Dist.] 1995, no writ). "The exception to this rule is when application of

---

**3.** The entire section of 911b is *repealed by* Act of June 15, 1995, 74th Leg., R.S. ch. 705, § 31(a)(4), Tex. Gen. Laws 3740.

the statute's plain language would lead to absurd consequences that the legislature could not have intended." *Id.* We are to presume that the entire statute is intended to be effective. *Industrial Accident Bd. v. Martinez,* 836 S.W.2d 330, 333 (Tex.App.—Houston [14th Dist.] 1992, no writ); TEX. GOV'T CODE ANN. § 311.021(2) (Vernon 1988).

Under the "plain meaning" standard of statutory construction rules, it appears that Rutledge falls within the definition of "motor carrier." Unquestionably, at the time of the accident Rutledge was a "person ... operating ... [a] motor propelled vehicle used in the transporting of property for compensation or hire over in public roadway in this state ... " *See* TEX.REV.CIV. STAT. ANN. art. 911b, § 1(g).

But, concluding that Rutledge is a motor carrier leads to "absurd consequences" that could not have been intended by the legislature. *See Norton,* 899 S.W.2d at 304. To reach this conclusion would require this court to ignore numerous provisions of the MCA. In fact, we would have to ignore the very provisions that make up the heart of the statute. The most prominent of these are sections 3, 5, and 6 that require the motor carrier to obtain a permit. *See* TEX.REV.CIV. STAT. ANN. art. 911b, §§ 3, 5, and 6. These sections state that no motor carrier shall operate without first having obtained a certificate of public convenience from the TRC. If Rutledge is a motor carrier, he and every other driver would have to get a certificate of public convenience from the TRC, and the TRC would be required to conduct a hearing on whether a certificate should be issued to them. *See* TEX.REV.CIV. STAT. ANN. art. 911b, §§ 11–12. Nothing in the statute reflects an intent on the part of the legislature to require a permit and hearing for every commercial truck driver in the state of Texas. In fact, Carway does not make this argument.

We also would have to ignore section 13, which requires a motor carrier to post bonds or give proof of insurance to cover loss or damages before a permit can be issued. *See* TEX.REV.CIV. STAT. ANN. art. 911b, § 13. If Rutledge is a motor carrier, he is required to have his own insurance to cover him while driving the trucks; yet, Carway does not contend that Rutledge was required to obtain insurance. Finally, section 13b requires the motor carrier to keep a set of accounts and authorizes the motor carrier to file reports with the TRC. *See* TEX.REV.CIV. STAT. ANN. art. 911b, § 13b. If Rutledge was a motor carrier, he and all other drivers would have to comply with this provision as well. Neither party contends this is required under the MCA. In sum then, classifying Rutledge as a "motor carrier" under the MCA imposes requirements on him that the legislature could not have intended.

Furthermore, when the term driver/employee is substituted for motor carrier in other sections of the MCA a conflict appears, for the act clearly contemplates that a motor carrier and its driver/employees are separate and distinct entities.[4] For example, section 6–cc mandates that no *motor carrier* shall allow a *driver* to drive a truck for more than ten consecutive hours. TEX.REV.CIV. STAT. ANN. art. 911b, § 6–cc. Again, in section 1(j) the statute contemplates a driver separate from the motor carrier, defining the term "transporting property for compensation or hire" as "including the furnishing of equipment and *drivers.*" TEX.REV.CIV. STAT. ANN. art. 911b, § 1(j). Finally, the last paragraph of section 13 provides that the motor carrier shall carry worker's compensation for its employees: "Each motor carrier shall also protect his employees by taking out workmen's compensation insurance ..." *Id.* at § 13.

Carway argues the analysis we have just gone through is invalid because he maintains only that Rutledge *falls within the definition of motor carrier,* not that he *is* a motor carrier. If we were to adopt this argument, we would have to ignore virtually the entire statute, as we detailed above. We decline to do this. Moreover, we are prohibited by the rules of construction from doing this because we are to presume that every portion of the statute is intended to be effective. *See* TEX. GOV'T CODE ANN. § 311.021(2).

---

4. Certainly an individual may be a motor carrier, and in that instance the motor carrier and driver could be the same person, but we are not confronted with that situation.

Even if we were to adopt Carway's argument and *assume* Rutledge was a motor carrier, he still would not be covered under the Progressive policy. As we mentioned earlier, the policy does not specifically cover him. The only "motor carrier" covered under the Progressive policy is PST. Furthermore, nothing in the statute requires the motor carrier to cover its employees. The statute merely requires the motor carrier to show proof of insurance to get a permit to operate. *See* TEX.REV.CIV. STAT. ANN. art. 911b, § 13. It does not create coverage where none exists. *See* TEX.REV.CIV. STAT. ANN. art. 911b, § 13. In conclusion, we hold no coverage was created under the MCA and the trial court erred if it concluded coverage existed because Rutledge fell under the definition of "motor carrier."

### b. Did The Interstate Commerce Commission Regulations Create Coverage?

Our finding as to the MCA does not end our inquiry however, because Rutledge moved for summary judgment not only on the ground that the MCA created coverage, but also on the ground that the ICC regulations created coverage. Progressive maintains the trial court erred if it found coverage based on the documentation the ICC requires a motor carrier to file.

Progressive had to file an MCS–90 endorsement, which requires an insurer (1) to pay any judgment against an insured regardless of whether it also covers the vehicle, and (2) to be reimbursed by its insured for any amounts paid under the endorsement that it would not have otherwise paid. *See* 49 C.F.R. § 1042.1. Carway's argument with respect to the MCS–90 endorsement is similar to the argument it made in reference to the MCA: PST had to obtain coverage and PST was an insured, so its driver also must be an insured. We have found no case law supporting this claim. There is not a single case

holding that a driver/employee, who was not an insured under the plain terms of the policy, was nonetheless covered. In fact, the cases hold just the opposite.

> The explicit language of both the statute and the applicable regulation, 29 U.S.C. § 1097 and 49 C.F.R. § 1043.1, provide only that the ICC carrier must obtain and file with the ICC a surety bond, certificate of insurance or other security which is "sufficient to pay ... for each final judgment *against the carrier* for bodily injury to or death of an individual resulting from the negligent operation, maintenance or use of motor vehicles."

*Radman v. Jones Motor Co., Inc.,* 914 F.Supp. 1193 (W.D.Pa.1996) (emphasis added).

> It is one thing to hold that a motor carrier is absolutely liable—based on the Interstate Commerce Act—for injuries resulting from the negligent operation of vehicles leased to it, but it seems an unjustified and illogical leap to hold that an insurance company—whose sole obligation rests on contract—should be bound to pay a judgment for others who are not mentioned in the ICC insurance regulation (49 C.F.R. § 1043.1), and who are specifically excluded by the language of the policy.

*Wellman v. Liberty Mutual Ins. Co.,* 496 F.2d 131, 139 (8th Cir.1974). The *Wellman* court went on to note that ICC regulations require a motor carrier operating leased equipment to obtain insurance and to be held liable to the public for negligent operation of the leased vehicles just as the carrier is liable for negligent operation of its own vehicles. *Id.* at 138. But, in such a case, the injured party must sue the *carrier,* for only then would the insurer be liable to pay. *Id.* We find this reasoning relevant and compelling in this case. Thus, just as with the MCA, we conclude the ICC statutory filings did not create coverage,[5] making Progressive liable for the judgment against Rutledge.

---

5. We feel obliged to comment on the cases cited by both parties on this issue. Although each party argues their cases are controlling, we find none truly dispositive. They involve different fact situations and issues than those presented here. The fact pattern in this case involves a driver/employee who had an accident while oper-

ating a covered vehicle in the course and scope of his employment for a motor carrier. The issue is whether such a driver/employee, who is not a named insured in the policy, is nonetheless covered by the motor carrier's insurance policy simply because (1) he appears to meet the definition of a "motor carrier" under the MCA and (2)

### c. Do the Safety Responsibility Laws Create Coverage?

■ Carway also argues that coverage is created by article 6701h which, according to Carway, mandates that no motor vehicle may be operated in Texas unless a policy of automobile liability insurance is in effect.[6] Noting, once again, a requirement that the vehicle operator show proof of financial responsibility and pointing to certain sections of the article he claims support his position, Carway argues that the article makes Rutledge an insured. Under article 6701h, an owner of a motor vehicle liability policy shall pay "on behalf of the insured and any other person, as insured, using such motor vehicle with the express or implied permission of such named insured" all sums the insured is legally obligated to pay as damages arising out of the ownership or use of the motor vehicle. TEX REV. CIV. STAT. ANN. art. 6701h § 21(b) (Vernon 1984). As Carway notes, this language "is in keeping with the general purpose that no motor vehicle may be operated in Texas unless liability insurance is in effect to provide evidence of financial responsibility," and that the "coverage is for damages 'arising out of the ownership, maintenance or use of such motor vehicle....' " TEX.REV.CIV. STAT. ANN. art. 6701h § 21(b).

We view this argument as being identical to Carway's ICC argument and Carway acknowledges that it is. Consequently, we reach the same answer we arrived at on that issue. Rutledge was not a named insured in the policy and the law does not require Progressive, the motor carrier's insurance company, to pay a judgment against someone specifically excluded as an insured. This does not mean the act's purposes have been thwarted, however, because Progressive still must pay damages its *insured*, PST, is liable to pay. If Carway obtains a judgment against PST for damages arising out of the accident with Rutledge, who was acting in the course and scope of his employment, then Progressive will be liable. For these reasons, we conclude the Safety Responsibility Laws did not create coverage, making Progressive liable for the judgment against Rutledge.

### d. Did The Policy's Status as a Public Liability Policy Create Coverage?

■ In a related point, Carway maintains the Progressive policy, being a "public liability policy," protected and indemnified the public against accidents occurring on public roadways. Discussing the disarray present in the trucking industry before ICC and state regulations were enacted requiring motor carriers to have insurance, Carway argues the whole purpose of the public liability policies was to "protect the public from the abuse and confusion that typically surrounded responsibility for accidents that involved interstate trucking." We find our earlier discussions also dispositive of this issue.

The purpose of the MCA and the ICC regulations is to require that motor carriers have insurance to pay for accidents involving

the MCA and the ICC regulations require motor carriers to have insurance. The fact patterns and issues in the cases cited by the parties, are much different than we have here: (1) the plaintiff sued and obtained a judgment against the *covered motor carrier rather than the employee*, *Liberty Mut. Ins. Co. v. States*, 940 F.2d 1179, 1180–81 (8th Cir.1991), *cert. denied*, 502 U.S. 1032, 112 S.Ct. 874, 116 L.Ed.2d 778 (1992); (2) the driver was driving the motor carrier's vehicle but the vehicle was not being used in the business of the motor carrier, *Wellman v. Liberty Mut. Ins. Co.*, 496 F.2d 131, 136–37 (8th Cir. 1974); (3) the driver was driving the motor carrier's vehicle, but transporting goods for another motor carrier, *Id.* at 132; or (4) the driver's employer had a policy covering employees and/or anyone using the vehicle with the insured's permission. *Campbell v. Bartlett*, 975 F.2d 1569, 1581 (10th Cir.1992); *Connecticut* *Indem. Co. v. Harris Transport Co.*, 909 F.Supp. 1212 (W.D.Ark.1995).

Citing to additional case law, Carway also argues that Progressive cannot limit coverage because ICC regulations "declare void and unenforceable any condition, provision, stipulation, or limitation in the policy." But the courts have not interpreted this language to mean that insurance coverage can be *created* where none is provided for, only that certain defenses, such as lack of notice, cannot *defeat* coverage that exists. *Campbell v. Bartlett*, 975 F.2d 1569, 1580–81 (10th Cir.1992); *Liberty Mut. Ins. Co. v. States*, 940 F.2d 1179, 1180–81 (8th Cir.1991), *cert. denied*, 502 U.S. 1032, 112 S.Ct. 874, 116 L.Ed.2d 778 (1992).

6. The entire section of 6701h is *repealed by* Act of May 23, 1995, 74th Leg., R.S., ch. 165, § 24(a), Tex. Gen. Laws 1871.

their vehicles, or post a bond to pay for these accidents. We have found no statutory provision or case law requiring that motor carriers also obtain insurance for their drivers, however laudable that requirement may be. As noted in our earlier discussion of the MCA and the ICC regulations, both the MCA and the ICC regulations require that public liability insurance exist to satisfy any judgment taken against a *motor carrier*. *See* 49 U.S.C. § 10927; 49 C.F.R. § 1043.1; Tex. Rev.Civ. Stat. Ann. art. 911b § 13 (1987); Tex.Rev.Civ. Stat. Ann. art. 6701h § 21 (1987). They do not require that motor carriers obtain insurance to pay a judgment entered against a *driver*.

In reaching this conclusion, we note that Carway is not without recourse for his injuries. We have an insured who is still a defendant in Carway's suit and whose policy apparently covers the accident. Thus, the public policy of the statute is not thwarted by a conclusion that Rutledge was not covered by the Progressive policy. We therefore conclude that this ground also does not support a summary judgment in favor of Carway on coverage.

### e. Did The PIP, UM & UIM Endorsements Create Coverage?

Finally, Carway claims the personal injury protection ("PIP"), uninsured motorist ("UM"), and underinsured motorist ("UIM") endorsements broaden the definition of insured in the Progressive policy to include "anyone else occupying" a covered "auto." Several problems exist with this argument. First, we cannot tell if the endorsements apply in Texas. More importantly, however, the endorsements do not apply to the circumstances of this accident. PIP coverage is triggered when an *insured* is injured "out of the use or operation of the [covered vehicle]." An insurer is required to pay UM coverage when the *insured* sustains bodily injury in a vehicular accident and is entitled to recover damages from the owner or driver of an insured motor vehicle. UIM coverage is the same as UM coverage except that the insured must have had an accident with an underinsured vehicle and have been injured.

Clearly the accident at issue in this case does not fit the coverage situations just described, most obviously because the *insured* must be injured for the coverage to trigger. We do not have an injured insured in this case. Thus, even if the PIP, UM and UIM endorsements were operative in Texas, they would provide coverage only if *Rutledge* had been injured by Carway.

■ Carway also argues that the broader definition of insured ("anyone occupying a covered auto") contained in the PIP, UM and UIM endorsements changes the definition of insured contained in the declarations portion of the policy. Pointing to the fact that all three endorsements contain the bold-typed statement, "THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY," Carway urges us to conclude that the parties meant to change the definition of insured throughout the policy, even when coverage under the endorsement has not been triggered. Carway has cited us no law in support of this proposition and we decline to so hold. In so holding, we note that our conclusion does not negate the bold-faced type at the top of the endorsements. The endorsements still change the policy by creating coverage where none would exist otherwise and by broadening the definition of insured, but the changes are effective only when certain conditions are met. In short, we hold that the trial court erred if it found coverage existed because of the PIP, UM, or UIM endorsements.

In conclusion, having found that no coverage existed, we conclude the trial court erred in granting Carway's motion for partial summary judgment claiming that coverage existed. Since no coverage exists, we need not address Progressive's third complaint under its point of error regarding the applicability of the policy's notice provisions. Progressive's sole point of error is sustained.

### PCMIC & PROGRESSIVE'S MOTION FOR SUMMARY JUDGMENT

We now turn to PCMIC's and Progressive's cross-motion for summary judgment. Carway argues in his first point of error that the trial court erred in granting PCMIC's motion for summary judgment because

"there is insufficient evidence to support PCMIC's assertion that it had no applicable policy of insurance pertaining to Carway's claims." PCMIC relies in turn on its summary judgment evidence, which it claims established it had no policy covering Carway's claims. Carway argues PCMIC is an insurer because the insurance certificate filed with the TRC, Form E, lists PCMIC as an insurer. Additionally, Carway argues the trial court erred in finding PCMIC was not an insurer. Carway contends PCMIC's summary judgment proof was insufficient to prove it was entitled to judgment as a matter of law.

Carway asserts for the first time on appeal that the affidavit of Jerome Iwler, attached to PCMIC's motion for summary judgment, is conclusory and not based on personal knowledge. Objections to defects in the form of affidavits must be raised in the trial court. TEX.R. CIV. P. 166a(f); *Ramirez v. Transcontinental Ins. Co.,* 881 S.W.2d 818, 829 (Tex.App.—Houston [14th Dist.] 1994, writ denied); *see Grand Prairie Independent School District v. Vaughn,* 792 S.W.2d 944, 945 (Tex.1990) (holding failure to object to personal knowledge is form defect). Objections to defects in the substance of affidavits, however, may be raised for the first time on appeal. *Schultz v. General Motors Acceptance Corp.,* 704 S.W.2d 797, 800–01 (Tex.App.—Dallas 1985, no writ) (Howell, J., concurring); *Habern v. Commonwealth Nat'l Bank,* 479 S.W.2d 99, 100–01 (Tex.Civ.App.—Dallas 1972, no writ). An objection to an affidavit on grounds that it states only a legal conclusion is one that relates to a defect of substance. *Bell v. Moores,* 832 S.W.2d 749, 756 (Tex.App.—Houston [14th Dist.] 1992, writ denied); *Schultz,* 704 S.W.2d at 801. Because Carway's claim that Jerome Iwler's affidavit is not based on personal knowledge is a form defect, we need not address it. *See Ramirez,* 881 S.W.2d at 829. We *will* address Carway's claim that Iwler's affidavit is conclusory because that raises a defect of substance, which can be raised for the first time on appeal. *See Bell,* 832 S.W.2d at 756.

In his affidavit, Iwler, an attorney employed by Progressive, essentially swore

there was no PCMIC insurance policy covering Carway's assigned claims, and the only insurance company involved in the Carway matter was Progressive. A summary judgment based on an affidavit of an interested witness must be clear, positive, direct, otherwise credible, free from contradictions and inconsistencies, and capable of being readily controverted. TEX.R. CIV. P. 166a(c); *Republic Nat. Leasing Corp. v. Schindler,* 717 S.W.2d 606, 607 (Tex.1986). Undoubtedly Iwler, as an employee of Progressive, is an interested witness. Thus, the question is whether his affidavit met the requirements of 166a(c).

I am an attorney employed in the Motor Carrier Division of Progressive Casualty Insurance Company. I have been so employed for eight years. I am licensed as an attorney in the Commonwealth of Pennsylvania. I have personal knowledge of the following facts because in my employment here, I have become familiar with the corporate organization of The Progressive Corporation, and the various companies owned by The Progressive Corporation.

I have personal knowledge that Progressive Casualty Insurance Company has a Management Contract with Progressive County Mutual Insurance Company, which is a county mutual insurance company organized under the insurance laws of the State of Texas, which does no business outside the state of Texas, has no employees of its own, and is operated in accord with the Management Contract with Progressive Casualty Insurance Company. I personally handle and supervise Progressive Casualty Mutual Insurance Company claims under that Management Contract with Progressive Casualty Insurance Company. Progressive County Mutual Insurance Company is run under the supervision of the Insurance Commissioner of the Texas Department of Insurance, and is organized and operated in accord with the State of Texas insurance laws and regulations.

On several occasions, including shortly before making this affidavit, I have personally reviewed, as part of my work, the file in the claim which became the lawsuit styled

*Carway v. Pacific States Transport, Inc., et. al.,* Cause No. 91–09334, in the 80th Judicial District Court of Harris County, Texas. The insurance policy attached to the Motion for Summary Judgment in Civil Action No. H–94–4336 is a true and correct copy of Progressive Casualty Insurance Company Policy No. 7610108–1. The plaintiff Carway's accident of April 14, 1989 with a truck tractor driven by Rutledge occurred during the period this policy covered PST Vans, Inc.

In reading the insurance policy in that file, it is clear that the original defendant Pacific States Transport, Inc., if it exists, was not insured by Progressive Casualty Insurance Company under this policy, but that PST Vans, Inc., was. It is also clear from the file that Progressive County Mutual Insurance Company had no involvement whatsoever in this file. When I reviewed and handled this file and spoke with attorneys for Mr. Carway, I was always acting on behalf of Progressive Casualty Insurance Company.

In my review of the file, it clearly appears that all insurance company claims personnel who worked on this file did so with regard to and on behalf of Progressive Casualty Insurance Company. I was never acting on behalf of Progressive County Mutual Insurance Company in the *Carway* claim or lawsuit. To my personal knowledge, Progressive County Mutual Insurance Company had no policy, no coverage and no involvement in the *Carway* claim or lawsuit.

We find this affidavit is based on Iwler's personal knowledge and is not conclusory in that it gives a detailed description of his involvement in this case. Because he is in charge of handling PCMIC's claims with Progressive under the management contract, he would have knowledge of any involvement PCMIC would have had in this case. We conclude Iwler's affidavit is based on personal knowledge and relates facts that would be admissible in evidence at a conventional trial on the merits, not mere conclusions. *See* TEX.R. CIV. P. 166a(f).

Carway next argues the Form E insurance certificate, which listed PCMIC as the insur-er on the Progressive policy, directly controverted Iwler's affidavit and his assertions that PCMIC had no policy or coverage in the Carway claim. Once again, Carway brings up this argument for the first time on appeal. Carway never raised this argument in response to Progressive and PCMIC's motion for summary judgment. Carway did mention the fact in passing in its partial motion for summary judgment, but the point was never raised in its response to PCMIC's motion for summary judgment. In fact, Carway's response does not even discuss the basis of his claim for coverage against PCMIC; this response mentions only Progressive. Carway cannot now make this argument for the first time. *See City of Houston v. Clear Creek Basin Auth.,* 589 S.W.2d 671, 678 (Tex.1979); *Bado Equip. Co., Inc. v. Bethlehem Steel Corp.,* 814 S.W.2d 464, 474 (Tex.App.—Houston [14th Dist.] 1991, no writ); TEX.R.APP. P. 52(a); *see also* TEX.R. CIV. P. 166a(c). Therefore, we overrule Carway's first point of error.

The remainder of Carway's cross-points of error pertain to coverage-related issues: the accrual date of the statute of limitations, and whether the two or four-year statute of limitations covered Carway's claims for breach of the duty to defend and failure to indemnify. These cross-points are now moot in light of our holdings that Progressive's policy did not cover Rutledge and that PCMIC had no policy covering Carway's claims.

## CONCLUSION

In summary, we hold the trial court erred in holding Progressive was liable for the $1,500,000 judgment entered in favor of Carway against Rutledge because Rutledge was not covered under the Progressive policy. We reverse this portion of the judgment and render a take nothing judgment in favor of Progressive. We also hold the trial court correctly concluded that PCMIC did not issue a policy on behalf of Rutledge and therefore affirm this portion of the judgment holding PCMIC not liable.